Filed 6/29/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S056766 |
| v. | ) | |
| | ) | |
| RICHARD LEON, | ) | Los Angeles County |
| | ) | Super. Ct. No. PA012903 |
| Defendant and Appellant. | ) | |
| _____ | ) | |

During a month-long crime spree in Los Angeles County, defendant Richard Leon committed a string of armed robberies, murdered two store clerks, and was eventually arrested after a high-speed chase. A jury convicted him of two counts of murder, 16 counts of robbery, three counts of assault with a deadly weapon,[1] and two counts relating to the chase.[2] It found defendant personally used a firearm during all offenses except the evasion charges and one robbery.[3] It found true the special circumstances of robbery murder and multiple murder[4] and fixed the penalty at death. We affirm the conviction but reverse the penalty determination due to the erroneous exclusion of three prospective jurors.

---

[1] Penal Code sections 187, subdivision (a), 211, and 245, subdivision (a)(2). All statutory references are to the Penal Code unless otherwise stated.

[2] These crimes were resisting a peace officer (§ 148, subd. (a)(1)) and evading an officer with willful disregard for safety (Veh. Code, § 2800.2).

[3] Section 1203.06, subdivision (a)(1), and former section 12022.5, subdivision (a).

[4] Section 190.2, subdivision (a)(3) and (17).

# I. BACKGROUND

A.      *Guilt Phase*

        1.      *Incidents*

Defendant committed some crimes with one or two accomplices. Witnesses typically described him as White and his partners as Black.

        a.      *January 14: Chan's Shell Service Station Robbery*

Around 7:00 p.m. on January 14, 1993, defendant walked into a Hollywood service station, held the manager at gunpoint, and demanded that he open the register. Manager David Su complied. Defendant emptied the register, ordered Su to the ground, and threatened to kill him if he moved. Another employee, Roberto Zaldivar, emerged from the bathroom and saw Su lying on the floor. Defendant ordered Zaldivar back into the bathroom, where he stayed for about two minutes. When he emerged defendant was gone. The crime was recorded on videotape and shown to the jury.

Su described the robber as a "skinny" White man, approximately six feet tall, 150 to 155 pounds, in his mid-30s, with a mustache and dark hair in a ponytail. A week or two after the robbery, Su picked defendant's photo from a group of six photographs (photo array). Su also selected defendant at a live lineup and identified him at trial.

        b.      *January 19: Ben's Jewelry Robbery*

Around 1:00 or 2:00 p.m. on January 19, 1993, a Black man entered Ben's Jewelry in Beverly Hills and began looking at the cases. Marina Pekel showed the man some jewelry while Yossi Dina and Shant Broutian worked in their rear offices. About five minutes later defendant, described as a White man with long hair and a long coat, walked into the store. He pulled a revolver and ran toward the back of the store. Broutian grabbed his own gun and turned to face defendant. After a brief confrontation, Broutian surrendered his weapon. Defendant ordered Broutian and Pekel to lie on the showroom floor. Hearing the commotion, Dina retrieved a semiautomatic pistol from his desk but looked up to find the Black man

2

pointing a gun in his face. The man put the gun barrel in Dina's mouth, asked for a key to the showcase, and ordered Dina to lie on the floor next to Pekel and Broutian. At this point, a younger Black man joined the robbers.

Two customers came in during the robbery. Clifford Young was immediately accosted by one of the Black robbers, who held a gun to his head while defendant demanded his money. They took Young's cash and pushed him into a rear bathroom. Defendant also forced Gregory Lansing to the back of the store. He held one gun to Lansing's head and another to his chest. At defendant's demand, Lansing surrendered his money.

The customers and employees were moved to the rear bathroom, where their hands and feet were bound with duct tape. Pekel was tied up after she emptied merchandise from the showcases into a trash bag defendant held. One robber demanded the safe key, which Dina relinquished. The victims were told to remain quiet or they would be killed. After the robbers left, Broutian freed himself and the others. They found the showcases and safe open. Jewelry valued at nearly $800,000 had been taken.

All victims but Young viewed a photo array with defendant in position No. 5.[5] Broutian and Lansing selected photographs No. 3 and No. 5. Lansing specifically recalled the acne scars in photograph No. 5. Pekel circled only No. 5. Dina also selected No. 5 and testified that he was "100 percent" certain of the identification.

At trial, Broutian testified that defendant resembled the man who had held a gun to his face. Lansing identified defendant as the man who had held the two guns on him. Dina identified defendant at a live lineup, the preliminary hearing, and trial.

_____

[5] Young was to attend a live lineup, but it was canceled. He never made an identification.

3

### c. *January 30: H&R Pawnshop Robbery*

Around 1:00 p.m. on January 30, 1993, two men, one Black and one White, entered the H&R Pawnshop in North Hollywood and tried to sell a necklace. Owner Ruben Avsharian offered to buy it, but the men rejected his price and left. Three hours later they returned, accompanied by another Black man. When Avsharian declined to offer more for the necklace, each man produced a gun. The White man jumped over a counter, pointed a .38-caliber pistol at employee Hunan Ganazyan's temple, and told him to lie down. Avsharian and employees Ambertsum Sarkisyan and Vardkes Aslanyan were ordered to get on the floor. Then the robbers began shooting. They fired between 10 and 15 shots and shattered a large jewelry showcase. A bullet hit Avsharian's wrist, and Sarkisyan was shot in the thigh. After a few minutes, the robbers demanded to be let outside. Someone buzzed open the security door, and they left.

Many pieces of jewelry were taken. An empty holster, capable of holding a .38-caliber handgun, was found near the shattered showcase. Police recovered multiple bullet casings and slugs at the scene. Defendant's left palm print was lifted from a glass display case.

Avsharian, Ganazyan, and Aslanyan picked defendant's photograph from a photo array. Ganazyan and Aslanyan identified defendant at a live lineup. Avsharian did not. At trial, all three victims testified defendant was one of the robbers.

### d. *February 2: Sun Valley Shell Robbery Murder*

Around 7:30 p.m. on February 2, 1993, Raffi Rassam pulled into a Shell station in Sun Valley. He noticed a white car and a Jeep Cherokee with side paneling parked behind the store. Someone sat in the Jeep with the engine running. Rassam parked at a pump, walked into the store, and handed the cashier $14 for gas. The cashier's name was Norair Akhverdian, but Rassam knew him as "Nick." Rassam tried to fill his gas tank, but the pump had not been turned on. He walked back toward the store but stopped when he heard change falling.

4

Akhverdian was behind the cash register, facing a man across the counter and looking "very scared." The man jumped over the counter and shot Akhverdian. The assailant then walked quickly past Rassam toward the Jeep. He had a ponytail and an acne-scarred complexion. Rassam called the police.

Melikset Kirakosyan was working in a back hallway when he heard a gunshot and Akhverdian yelling. He found Akhverdian lying on the floor behind the register, unconscious but breathing. He called 911.

The cash drawer lay upside-down on the floor, devoid of currency. Police recovered a .380-caliber shell casing and expended bullet. These were later matched to a Walther handgun recovered from defendant's car. Videotape from the store's security camera showed an individual jump the counter holding a dark item. Akhverdian's arms were lowered in front of his body when he was shot. He died of a single gunshot wound to the heart.

Rassam picked defendant's photograph and one other from a group of six. At a live lineup, Rassam identified defendant as the shooter. He also identified defendant at trial, stating he was "confident 110 percent."

        e.    *February 10: Jack's Liquor Robbery Murder*

Around 3:45 p.m. on February 10, 1993, Yepraksia Kazanchian was working at a hamburger shop on Hollywood Boulevard when she heard gunfire. Kazanchian ran to the front of the shop and saw a customer pointing toward Jack's Liquor. Kazanchian saw a beige or white car with wood paneling stopped on the street 25 to 30 feet from Jack's. The car immediately drove away.

Anthony Schilling and Gordon Keller heard two gunshots while working on a rooftop near Jack's Liquor. Schilling saw a man with long brown hair in a ponytail standing in front of the liquor store. The man turned and walked down Hollywood Boulevard. An African-American man jogged up and began walking with him. Keller also saw the pair walking together.

Hratch Hannessian was working next door to Jack's when he heard two or three shots fired in quick succession. Seconds later, a man emerged. He had

5

brown hair in a ponytail that hung to just above his waist. He tucked a gun into the waistband of his pants then walked slowly toward Hollywood Boulevard and around a corner. Hannessian ran into the liquor store and found the clerk, Varouj Armenian, lying in a pool of blood. Hannessian called 911, then attempted first aid. Armenian, who had been shot twice in the head, died at the scene.

On the evening before the murder, Armenian's wife had given him $2,000 to deposit in the bank. He put the money in a blue Security Pacific Bank bag, which he typically placed on the back of the store's counter. Police found $1,000 in Armenian's pocket, but the bank bag was missing. The money was never deposited. The cash register drawer was open and most of the money gone. Crime scene investigators recovered two bullet casings, an intact bullet, and a bullet fragment. All had been fired from a .380-caliber semiautomatic handgun. Armenian's body revealed no signs of a struggle. No other weapon was found in the store.

Hannessian's father was present when the son was shown photos. He urged Hannessian not to make an identification because it could bring harm to the family. Hannessian picked no photo in his father's presence. He did select defendant at a live lineup, however, and testified he was "100 percent" certain of the identification. He also identified defendant at trial as the person he saw leaving Jack's Liquor immediately after the shooting.

f. *February 11: Seven Star Motel Robbery*

Shortly after 2:00 p.m. on February 11, 1993, defendant and a Black man loitered in the lobby of the Seven Star Motel in Hollywood. When the manager, Mei Chai, opened the door to her office, the two pushed their way inside. The Black man carried something covered with a towel. Chai thought it might be a gun. He held it against her back and pushed her into a corner. Defendant demanded money, opened a desk drawer, and took $200 to $300. He also took $70 from Chai's purse. The robbers fled.

6

Chai identified defendant from a photo array and at a live lineup. She also identified him at trial, noting he wore the same long hair he did on the day of the robbery. Chai had seen defendant at the motel a day or two before the robbery. She kept index cards of people who stayed at the motel and found a card with defendant's name on it.

g.  *February 17: Original Blooming Design Robbery*

Between 11:00 a.m. and noon on February 17, 1993, three men wearing dark, oversized clothes and baseball caps walked into Original Blooming Design, a flower shop in Arleta. They asked the clerk, Homer Vela, if he had any "after Valentine specials." When Vela said no and turned away, one of the men grabbed him, put a gun to his temple, and told him not to look up. Vela described this man as at least six feet tall and slim, with "kind of fair skin." The other two men were Black or Hispanic. One was shorter and "kind of chunky"; the other was almost six feet tall and fairly slim. The fair-skinned man jumped over the counter and tried to open the cash register. Failing, he ordered Vela to open the register and took about $50 in bills. He demanded more money, but Vela had none. Eventually the men left, threatening to shoot Vela if he resisted.

Vela attended a live lineup but made no identification. At the preliminary hearing, he identified defendant as the tall, fair-skinned man who had held a gun to his head. Because Vela was unavailable to testify at trial, a transcript of his preliminary hearing testimony was read to the jury.

During the robbery, an employee at the locksmith service next door noticed a tan Jeep Wagoneer parked directly in front of his business. The car had been backed into a parking space and the motor was running. A large Black man sat in the driver's seat. He covered his face with his hand when the employee walked past. Minutes after the robbery, the Jeep was gone.

h.  *February 17: Rocky's Video Robbery*

On February 17, 1993, 18-year-old Maria Medina was working at Rocky's Video with her 12-year-old nephew, Jose. The store was approximately two miles

from the flower shop.  Around 12:15 p.m., defendant and two Black men walked in and asked if the store carried a particular movie.  Jose began to look it up on the computer.  One of the Black men put a gun to his temple and forced him to lie on the floor in a back office.  The man took $2 from Jose's pocket.  Meanwhile, defendant jumped over a counter and pointed a gun at Medina's stomach.  She gave him $200 from the register.  When asked for more, she gave him the money in her pocket.  Defendant rifled through a drawer and took the rolls of change stored there.  He led Medina to the office at gunpoint and ordered her to lie down next to Jose.  When they emerged later, they found that Jose's portable stereo had been stolen.

The day after the robbery, Jose selected defendant's picture from a photo array.  He also picked defendant at a live lineup and identified him at trial.  Jose thought defendant had a memorable face.  Medina also identified defendant from photos, at a live lineup, and in court.

i.      *February 17: Nice Price Store Robbery*

The Nice Price discount store was located next door to Rocky's Video.  Around 12:20 p.m. on February 17, 1993, a slightly "chubby" Black man entered followed by defendant, who had a ponytail and acne scars and carried a portable stereo.  Defendant pointed a large gun at the clerk, Alma Najarro, and announced, "This is a robbery."  At their order, Najarro gave them all the money in the register and in her purse.  Najarro selected defendant from photos and identified him at trial.

j.      *February 17: Valley Market Robbery*

Around 12:25 p.m. on February 17, 1993, three men walked into the Valley Market in North Hollywood and took money from the cash registers at gunpoint.  The clerk picked defendant's photo from an array and identified him at trial.  The robbery was captured on the store's security camera, and the videotape was played for the jury.  One of the robbers in the video wore a distinctive black jacket similar to the one defendant was wearing when arrested.

8

2.    *Apprehension and Investigation*

On February 18, 1993, Los Angeles Police Department patrol officers were looking for a white Jeep Cherokee with wood paneling. Seeing such a vehicle, they activated their lights and siren. The Jeep sped up, made a sharp right turn, and fishtailed. Although it struck two vehicles, the Jeep sped on, driving up to 65 miles an hour on wet city streets. With the police in pursuit, the Jeep wove through traffic, driving on the center divider and into oncoming traffic lanes. Finally, the Jeep hit a curb, flew into the air, and struck a pole. Defendant jumped from the driver's side, and Darren White left the front passenger seat. Both ran. White was caught nearby. Defendant was found hiding in some bushes. The Jeep's rear passenger, Ray Rios, emerged more slowly and was arrested at the crash site.

Defendant wore a black jacket and had his black hair in a ponytail. He was 26 years old, approximately six foot two and 185 pounds. White, an African-American man, was approximately five foot eight and 190 pounds. Rios, also African-American, was approximately five foot six, weighing 160 to 165 pounds.

In the Jeep, along with sunglasses, several baseball caps, jackets, and duct tape, police found two loaded .380-caliber handguns: a blue steel Iver Johnson and a blue steel Walther. A firearms analyst determined that four expended cartridges and one bullet found at the scene of the H&R Pawnshop robbery had been fired from the Iver Johnson. A cartridge case and expended bullet recovered from the Sun Valley Shell scene matched the Walther. Two expended cartridges and a bullet found at Jack's Liquor had also been fired from the Walther.

Defendant was tried alone. He called two guilt phase witnesses challenging specific testimony about the Jack's Liquor incident.

B.      *Penalty Phase*

1.      *Prosecution Evidence*

a.      *Victim Impact*

Murder victim Norair Akhverdian's children were five and three years old when he was killed.  He was also stepfather to two teenagers.  Akhverdian was already dead when his wife arrived at the hospital.  After the murder, she developed a heart problem and the youngest child had to see a psychologist.  Akhverdian's brother described him as a good father, who coached his children and taught them swimming and soccer.  Varouj Armenian also had young children, ages four and five, when he was murdered.  The liquor store he owned with his wife was named for their son, Jack.  He was described as a caring, gentle man and a loving father.  Armenian and his wife had planned to have lunch together on the day of the murder, but he died before she saw him.

b.      *Other Crimes*

Defendant was convicted of robbing Richard Burd in 1985.  Burd picked up defendant, who was hitchhiking, and spent the evening drinking beer with defendant and his friend.  Burd awoke the next morning in a drainage ditch.  His van and wallet were missing, and he had suffered a fractured eye socket.  When defendant was arrested, he admitted hitting Burd with a beer bottle and stealing his money and van.

Defendant was also involved in three jailhouse incidents while awaiting trial.  In the first, an inmate asked defendant if he could give him "jailhouse change" for a $20 bill.**6**  Defendant pocketed the cash and walked away.  When he was followed, defendant turned and hit the inmate multiple times.  Next, defendant stood across the cell from a fight that was taking place among 10 or 15 inmates.  Defendant walked over twice, punched one of the men fighting, then retreated unharmed to his position across the cell.  In the third incident, defendant and a

---

**6**      An inmate making "jailhouse change" keeps a small portion for himself.  Jailhouse change for a $20 bill would typically be $19.

companion intimidated a developmentally disabled inmate into giving them a $20 bill.

2. *Defense Evidence*

Defendant's family relocated from a reservation in South Dakota when his mother was a child. His mother used drugs while pregnant. Defendant and his sister sometimes lived in a truck or with their grandmother. Their parents often left them home alone with drugs and paraphernalia lying around. Defendant's father disciplined him harshly, often beating him with a belt. Defendant later lived in a boys' home and other placements. At age 17, he lived alone with his sister, and they frequently used drugs together. Although he was not working, defendant brought home rent money and food when his sister was pregnant. He also took in a younger brother and sometimes babysat his stepmother's children. While in jail, defendant earned a high school diploma and a certificate of achievement in computer operations.

Defendant offered expert testimony about the Native American cultural experience and substance abuse. Alcohol was "a big problem" in defendant's family, and he became addicted to drugs and alcohol at a young age. Based on the severity of the addiction, the expert thought it likely defendant had committed the charged crimes while under the influence of drugs or alcohol.

## II. DISCUSSION

A. *Pretrial Issues*

1. *Limitations on Jury Selection*

Defendant claims his state and federal constitutional rights to a fair and impartial jury were violated because the court refused to examine jurors' attitudes about capital punishment for multiple murder and the mitigating effect of childhood abuse.[7] While the voir dire itself was brief, it was not so inadequate as

---

[7] "With regard to this claim and virtually every other claim raised on appeal, defendant asserts that the error violated his rights to a fair trial and reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the

11

to violate due process.  The topics defendant sought to explore were adequately covered by questions presented both orally and in the jury questionnaire, and the court did not abuse its discretion in rejecting defendant's proposed additions.

>### a.     *Jury Questionnaire*

All prospective jurors were asked to complete a 25-page jury questionnaire. It explored many aspects of jurors' backgrounds, education, job, family, place of residence, and past experience with the legal system.  Jurors were also asked about their sources of news and entertainment, exposure to high-profile criminal cases, views on the criminal justice system, and feelings about those charged with crime. They were asked whether they could keep an open mind while listening to the evidence, be fair to both sides, and follow instructions on the law.

A separate section explored attitudes about capital punishment.  It asked about "general feelings" on the death penalty, whether it is used too much or too little, and whether jurors belonged to any group advocating either increased use or abolition of the death penalty.  After explaining that the guilt phase of a capital trial is followed by a penalty phase if special circumstances are found true, the questionnaire presented a series of questions based on *Witherspoon v. Illinois* (1968) 391 U.S. 510 (*Witherspoon*) and *Wainwright v. Witt* (1985) 469 U.S. 412 (*Witt*).  Specifically, it asked whether jurors would refuse to find a defendant

United States Constitution and corresponding provisions of the California Constitution.  In most instances, defendant failed to make these constitutional arguments in the trial court.  Nevertheless, unless otherwise indicated, we consider the merits of these newly raised arguments because either (1) the appellate claim is of a kind that required no objection to preserve it, or (2) the claim invokes no facts or legal standards different from those before the trial court, but merely asserts that an error . . . [also] violat[ed] the Constitution.  (See *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.)  In those circumstances, defendant's new constitutional arguments are not forfeited on appeal.  (*Ibid*.; see *People v. Partida* (2005) 37 Cal.4th 428, 433-439.)  Where rejection of a claim of error on the merits necessarily leads to a rejection of the newly asserted constitutional objection, no separate constitutional analysis is required . . . .  (See *Boyer*, at p. 441, fn. 17.)" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1233-1234, fn. 4.)

guilty of first degree murder, or find a special circumstance true, in order to avoid reaching a penalty phase, and whether jurors would automatically vote for either possible penalty without considering the aggravating and mitigating evidence presented. If they said they would return an "automatic" vote, they were asked whether they could weigh the evidence and consider aggravating and mitigating factors if instructed to do so by the court. Finally, jurors were asked whether they could set aside their personal feelings about the death penalty and follow the law.

Defendant sought to add five questions: (1) Would jurors always vote for or against the death penalty if a defendant was convicted of two murders with special circumstances of multiple murder and robbery murder? (2) Would jurors ignore mitigation evidence about the defendant's background as an "abuse excuse"? (3) Did jurors believe that a sentence of life imprisonment without parole means the person will remain in prison until they die? (4) Would jurors consider the cost of life imprisonment in deciding penalty? (5) Could jurors follow instructions to decide penalty based on aggravating and mitigating evidence alone, without regard to costs?

Although the court allowed some other additions to the questionnaire, it rejected these questions. The court reasoned it was not necessary to repeat the *Witherspoon/Witt* questions in the context of multiple murder because jurors would learn of the charges, including the particular special circumstances, before they answered the questionnaire. The court was not persuaded that an "abuse excuse" question was necessary although the widely publicized Menendez brothers trial had allegedly soured community attitudes about mitigation evidence based on a defendant's background. It rejected defendant's remaining three proposed questions as sufficiently covered elsewhere in the questionnaire. Defendant now claims these rulings deprived him of a fair and impartial jury. Because his briefing addresses only the first two proposed questions, we consider any challenge to the remaining questions waived. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

13

Death-qualification voir dire must avoid two extremes. It must not be so abstract that it fails to identify jurors whose death penalty views would prevent or substantially impair their performance as jurors. Likewise, it must not be so specific as to require prejudgment based on a summary of potential evidence. (*People v. Cash* (2002) 28 Cal.4th 703, 721-722 (*Cash*).) The court may not categorically prohibit inquiry into a subject "likely to be of great significance to prospective jurors" in deciding penalty. (*Id*. at p. 721; see *People v. Vieira* (2005) 35 Cal.4th 264, 286 (*Vieira*).) However, the court "has considerable discretion in determining the scope of voir dire" (*People v. Williams* (2006) 40 Cal.4th 287, 307), and this discretion extends to the wording of the questionnaire. Where the court exercises its discretion to exclude certain questions from the questionnaire, we will affirm unless the voir dire was so inadequate that the resulting trial was fundamentally unfair. (*People v. Carter* (2005) 36 Cal.4th 1215, 1250.)

The trial court did not abuse its discretion in excluding defendant's proposed question about an "abuse excuse." Other questions explored whether jurors could base their penalty verdicts on aggravating and mitigating evidence "regarding the facts of the crime *and the background and character of the defendant*" (italics added). The court could reasonably conclude an additional question on this subject was unnecessary. Defendant theorizes that, when his jury was selected, public sentiment disfavored mitigation based on childhood abuse because such evidence had recently featured in a highly publicized Los Angeles murder trial. The trial court was in the best position to determine the likely effect of that trial on local jurors. We will not second-guess that judgment 20 years after the fact.

It was also within the court's discretion to exclude questions about multiple murder. Our previous decisions have addressed the need for voir dire on this topic. In *Cash*, *supra*, 28 Cal.4th at page 719, the trial court mistakenly believed voir dire could encompass only those circumstances alleged in the charging document. It therefore prohibited all inquiry into whether jurors' penalty verdicts

14

would be influenced by proof that the defendant had previously committed murder. (*Id*. at p. 721.) To disallow any inquiry about this potential source of bias was ruled an abuse of discretion. (*Id*. at pp. 720-722.) When a defendant *does* have the opportunity to inquire on the subject, however, refusal to include a particular question is not error. In *Vieira*, *supra*, 35 Cal.4th at page 286, as here, the trial court conducted voir dire itself and generally did not allow counsel to question the prospective jurors. Even so, Vieira's defense counsel did not ask that the court question on attitudes toward multiple murder, or attempt to pose that question himself. Accordingly, there was no viable error claim. (*Id*. at pp. 286-287.)

*People v. Carasi* (2008) 44 Cal.4th 1263 (*Carasi*) is instructive. In *Carasi*, the trial court declined to expand the jury questionnaire to address particular special circumstances, including multiple murder. (*Id.* at pp. 1282-1283.) Instead, the court orally instructed on the murder and special circumstance charges before prospective jurors completed the questionnaire, so that jurors would have these case-specific charges in mind when answering the questions. (*Id*. at pp. 1283-1284.) This procedure was acceptable, we concluded, because it did not deprive the defendant of *all* opportunity to ascertain jurors' views on case-specific facts. (*Id*. at p. 1286.) "The gravamen of *Cash* and *Vieira* . . . is that the defense cannot be *categorically* denied the opportunity to inform prospective jurors of case-specific factors that could invariably cause them to vote for death at the time they answer questions about their views on capital punishment. By definition, such an opportunity arises where the trial court instructs all prospective jurors on such case-specific factors before any death qualification begins. It is logical to assume that when prospective jurors are thereafter asked (orally or in writing) whether they would automatically vote for life or death regardless of the aggravating and mitigating circumstances, they have answered the question with those case-specific factors in mind, and are aware of the factual context in which the exchange occurs." (*Id*. at p. 1287, italics added.)

15

The trial court here followed the same procedure. Immediately before the questionnaires were distributed, the court told prospective jurors that defendant stood charged with two counts of murder, with special circumstances of murder in the course of a robbery and multiple murder. The court described all other charges, as well, and noted that the People were seeking the death penalty. Prospective jurors not claiming hardship were then asked to complete the questionnaire. As in *Carasi*, it is reasonable to believe the jurors had these charges and special circumstances in mind when they completed the questionnaire. They were not giving their views on the death penalty in the abstract. Having been told the case involved multiple murders committed in the course of robberies, jurors would logically have reflected on their predisposition to vote for life imprisonment without parole, or death, in the context of this case.

### b. *Voir Dire*

In a related point, defendant complains that the voir dire process as a whole was "improperly truncated" and so inadequate as to deny him a fair and impartial jury.

Defendant moved for attorney-conducted, sequestered voir dire on issues pertaining to the death penalty, substantive crimes, and race. In the alternative, he proposed several questions for the court to ask. The motion was denied. Instead, as was its custom, the trial court conducted all voir dire without followup questions from the attorneys.[8]

The voir dire process, from hardship qualifications through the final selection of the jury, lasted three court days. Jurors not claiming a hardship were

---

[8] At the time of defendant's trial, there was no right to attorney-conducted, sequestered voir dire. Code of Civil Procedure former section 223 directed the court to conduct voir dire, with supplemental questioning from the parties allowed upon a showing of good cause. (Code Civ. Proc., former § 223 (added June 5, 1990, repealed eff. Dec. 31, 2000).) On appeal, defendant does not argue the court should have held sequestered or attorney-conducted voir dire, nor does he attempt to show good cause. Accordingly, any such claim has been waived. (See *People v. Stanley*, *supra*, 10 Cal.4th at p. 793.)

16

given from one to three hours to complete the 25-page jury questionnaire and asked to return the following week. The court then questioned the jurors individually about particular questionnaire responses. With the exception of cause challenges and occasional questioning at sidebar on sensitive matters, the proceedings were conducted in open court.

To explore attitudes about the death penalty, the court asked each potential juror the same four pattern questions in the questionnaire. These questions, based on *Witherspoon*, *supra*, 391 U.S. 510, and *Witt*, *supra*, 469 U.S. 412, were: (1) "Do you have such conscientious objections to the death penalty that, regardless of the evidence in this case, you would refuse to vote for murder in the first degree merely to avoid reaching the death penalty issue?" (2) "Do you have such conscientious objections to the death penalty that, regardless of the evidence in this case, you would automatically vote for a verdict of not true as to any special circumstance charged merely to avoid the death penalty issue?" (3) "Do you have such conscientious objections to the death penalty that, should we get to the penalty phase of this trial, and regardless of the evidence in this case, you would automatically vote for a verdict of life imprisonment without the possibility of parole and never vote for a verdict of death?" (4) "Do you have such conscientious opinions regarding the death penalty that, should we get to the penalty phase of this trial, and regardless of the evidence in this case, you would automatically, and in every case, vote for a verdict of death and never vote for a verdict of life imprisonment without the possibility of parole?" With very few exceptions, the court asked no additional questions and permitted no followup by the attorneys.

Such parsimony in death qualification voir dire is not commendable. "Recent decisions of this court have emphasized the importance of meaningful death-qualifying voir dire. We have reminded trial courts of their duty to know and follow proper procedure, and to devote sufficient time and effort to the process. [Citations.]" (*People v. Stitely* (2005) 35 Cal.4th 514, 539.) The

17

expenditure of a few minutes per juror is generally not unduly burdensome in a capital trial that will consume several weeks. (See *People v. Heard* (2003) 31 Cal.4th 946, 968.)

Nevertheless, the "trial court has considerable discretion to place reasonable limits on voir dire [citation], and to determine the number and nature of questions on the death penalty." (*Carasi*, *supra*, 44 Cal.4th at p. 1286.) This means the court has wide latitude to determine what questions will be asked and what format the questioning will follow. (*People v. Contreras* (2013) 58 Cal.4th 123, 143.) "Unless the voir dire 'is so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair, the manner in which voir dire is conducted is not a basis for reversal.' [Citations.]" (*Ibid.*)

The voir dire here was not so cursory as to render defendant's trial fundamentally unfair. All prospective jurors were asked individually whether they had feelings about the death penalty that would interfere with their ability to render fair verdicts in the guilt and penalty phases. They were not invited to elaborate on their views, but all jurors had an opportunity to describe difficulties they might have sitting on a death penalty case. Although the oral questioning was more brief than is often the case, this questioning, combined with the jury questionnaire, gave defendant adequate information to make informed decisions on peremptory challenges and challenges for cause. In previous cases, "[w]e have rejected complaints about 'hasty' (*People v. Navarette* [(2003)] 30 Cal.4th 458, 487-488) or 'perfunctory' voir dire. (*People v. Hernandez* (2003) 30 Cal.4th 835, 855.) We also have found no error where the court relied heavily on three, four, or five general questions tracking language from *Witherspoon*, *supra*, 391 U.S. 510, and *Witt*, *supra*, 469 U.S. 412, 424." (*People v. Stitely*, *supra*, 35 Cal.4th at p. 540.) While those cases may have involved more followup questions than were asked here, the manner of voir dire was not so unfair or unreasonable as to violate the constitution. (See *People v. Capistrano* (2014) 59 Cal.4th 830, 856-858.)

18

2.     *Cause Challenges*

Defendant next claims the court improperly excluded three prospective jurors based on their death penalty views. A ruling on a cause challenge will be upheld if it is fairly supported by the record. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1114.) Here, the record does not support the dismissals. Written and oral voir dire responses of the three excused panelists did not give the court sufficient information to conclude they were incapable of performing their duties as capital jurors. (*People v. Stewart* (2004) 33 Cal.4th 425, 451-452.)

a.     *Voir Dire of the Excused Jurors*

The questionnaire responses of the dismissed jurors were similar. All three expressed general opposition to the death penalty, although for various reasons. Prospective Juror R.C. wrote: "I do not believe the death penalty is a humain [*sic*] punishment. I do not believe the death penalty stops or prevents anyone from committing a crime." Prospective Juror D.A. said, "I think we should not have a death penalty at all," in response to a question about the frequency with which the penalty is imposed. When asked whether she would refuse to vote guilty simply to avoid a penalty phase, D.A. responded, "I don't believe in [the] death penalty." Prospective Juror N.C. likewise said she "disagreed" with the death penalty, but her reason was that a guilty person put to death "[would] not suffer anymore." Elsewhere, N.C. said she believed the death penalty is used "too seldomly."

The dismissed jurors also gave similar answers to the questionnaire's *Witherspoon/Witt* questions. Although none said they would refuse to vote for first degree murder or find a special circumstance proven to avoid a penalty phase, all three indicated that if the case reached that phase they would automatically vote for life imprisonment without parole. In response to the question whether he would "<u>automatically refuse</u> to vote in favor of the penalty of death and <u>automatically vote</u> for a penalty of life imprisonment without the possibility of parole," R.C. wrote, "I would vote for life imprisonment." Prospective Juror N.C. also answered "yes" to this question and explained that she was simply "in favor

19

of" life imprisonment without parole. Prospective Juror D.A. answered "no," but in response to the very next question, asking whether she would automatically vote for a penalty of *death*, D.A. stated, "Yes, I don't believe in death penalty."[9] However, immediately after disclosing their inclination to vote against the death penalty, all three jurors answered "yes" to questions asking if they would *change their answers* on automatic voting if instructed to set aside personal feelings and weigh aggravating and mitigating evidence before voting on penalty.[10]

The court began its inquiry by telling prospective jurors it was going to repeat questions about the death penalty they had already answered. It then asked each panelist the first four *Witherspoon/Witt* questions from the questionnaire, with very little variation or elaboration. The three dismissed jurors repeated their previous answers, again stating they would automatically vote for life imprisonment without parole over death.

When he was asked about returning an automatic vote, Prospective Juror R.C. responded, "That's the one I have a problem with." Pressed for an answer, he said he would vote for life imprisonment "[r]egardless of the evidence." The court dismissed him for cause and denied defense counsel's request for further questioning on whether R.C. could set aside these views and follow the court's instructions. Prospective jurors D.A. and N.C. also repeated their questionnaire

---

[9] Read in context, it appears D.A. may have confused this question with the previous one, asking whether she would automatically vote for life imprisonment without parole. Her answer of "yes" to the question whether she would automatically vote for death is immediately contradicted by the rest of the sentence, which restates her opposition to the death penalty.

[10] These questions were: "If your answer to either question (c) or question (d) [regarding automatic voting for life imprisonment without parole or death] was 'yes,' would you change your answer, if you are instructed and ordered by the court that you must consider and weigh the evidence and the above mentioned aggravating and mitigating factors regarding the facts of the crime and the background and character of the defendant, before voting on penalty?" And "Could you set aside your own personal feelings regarding what the law ought to be and follow the law as the court explains it to you?"

responses about automatic voting.  When asked whether they would "automatically, and in every case, vote for a penalty of life imprisonment without the possibility of parole and never vote for death," D.A. and N.C. both responded, "Yes."  The court dismissed them for cause over defense objection and without asking whether they could set aside these views and follow the law in determining penalty.

    b. *Discussion*

   A prospective juror's views about capital punishment may support an excusal for cause if those views would " 'prevent or substantially impair' " performance of the juror's duties in accordance with the court's instructions and the juror's oath.  (*Witt*, *supra*, 469 U.S. at p. 424; see *People v. Cunningham* (2001) 25 Cal.4th 926, 975.)  Exclusion is proper if the prospective juror " ' "is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate." [Citation.]' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 987.)  But personal opposition to the death penalty is not an automatic ground for excusal.  "It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." (*Lockhart v. McCree* (1986) 476 U.S. 162, 176.)

   The *Lockhart* approach contemplates a two-part inquiry.  It recognizes that a prospective juror may have strong feelings about capital punishment that would generally lead to an automatic vote, one way or the other, on that question.  However, it also allows for the possibility that such a juror might be able to set aside those views and fairly consider both sentencing alternatives, as the law requires.  Both aspects of the inquiry are important.  Here, the court did not inquire about the jurors' willingness to set aside their views and follow the law.

Accordingly, the record does not support a conclusion that the dismissed jurors were disqualified.

Prospective jurors may be dismissed based on written questionnaire responses alone if the responses leave no doubt that their views on capital punishment would prevent or substantially impair the performance of their duties in accordance with the court's instructions and the jurors' oath. (*People v. Wilson* (2008) 44 Cal.4th 758, 787.) By contrast, if a juror's questionnaire responses are inconsistent and do not clearly reveal an inability to serve, the court may not grant a cause challenge without further questioning to clarify the juror's views. (*People v. Riccardi* (2012) 54 Cal.4th 758, 782.) The dismissed jurors expressed opposition to the death penalty in their questionnaires, but all definitively stated they could set aside their personal feelings and follow the law as the court explained it. They disclosed an inclination to vote automatically but all responded in the very next question that they would "change [this] answer" if instructed to consider aggravating and mitigating factors before voting on penalty. Based on their written responses alone, these jurors appeared qualified to serve. They could not be excused for cause unless further questioning established that they were in fact unable or unwilling to set aside their personal views and follow the law in determining penalty.

Before granting a challenge for cause, the "court must have *sufficient information* regarding the prospective juror's state of mind to permit a *reliable* determination as to whether the juror's views would ' "prevent or substantially impair" ' " performance as a capital juror. (*People v. Stewart*, *supra*, 33 Cal.4th at p. 445, italics added.) Trial courts must therefore make "a conscientious attempt to determine a prospective juror's views regarding capital punishment to ensure that any juror excused from jury service meets the constitutional standard . . . ." (*People v. Wilson*, *supra*, 44 Cal.4th at p. 779; see *People v. Heard*, *supra*, 31 Cal.4th at pp. 965-966.) The cursory voir dire of the dismissed jurors here was simply not sufficient to permit an informed determination about their ability to

serve.  As noted, the court merely repeated the first four *Witherspoon/Witt* questions from the questionnaire.  When the prospective jurors repeated their answers about automatically voting for life imprisonment without parole, the court excused them without exploring whether they were capable of setting aside this bias and imposing a verdict of death if the evidence of aggravating and mitigating factors required it.  This was error.  An adequate *Witherspoon/Witt* voir dire cannot simply reaffirm prospective jurors' biases without also asking whether they are capable of setting them aside and determining penalty in accordance with the law.  Regardless of the jurors' personal views or inclinations, they were not disqualified from service unless they were incapable of setting aside these feelings and following the law.  (*Lockhart v. McCree*, *supra*, 476 U.S. at p. 176; *Witt*, *supra*, 469 U.S. at p. 424; *People v. Avila* (2006) 38 Cal.4th 491, 529.)

Typically, the trial court's determination as to a prospective juror's true state of mind is entitled to deference on appeal.  (*People v. Wilson*, *supra*, 44 Cal.4th at p. 779; *People v. Barnett*, *supra*, 17 Cal.4th at p. 1114.)  We have recognized that "[t]he trial court is in the unique position of assessing demeanor, tone, and credibility firsthand—factors of 'critical importance in assessing the attitude and qualifications of potential jurors.'  [Citation.]"  (*People v. DePriest* (2007) 42 Cal.4th 1, 21.)  However, this deference is not appropriate when the trial court decides cause challenges based on ambiguous written responses alone, without oral questioning.  (*People v. Stewart*, *supra*, 33 Cal.4th at p. 451.)  In such cases, the trial court's determination is informed by the same written record available to reviewing courts.  (*Ibid*.)

This case presents a hybrid situation.  The court below did conduct a limited oral voir dire, but it was insufficient.  Specifically, the court did not inquire about the jurors' ability to set aside their biases and follow the law despite clear statements in the questionnaires expressing the jurors' willingness to do so.  Nor does the record disclose any other basis for the court's findings of incapacity.  Under these circumstances, its conclusions are not entitled to deference.

23

Under binding United States Supreme Court precedent, error in excusing a prospective juror for cause based on the juror's views about the death penalty requires *automatic* reversal of the penalty verdict. (*Gray v. Mississippi* (1987) 481 U.S. 648, 667-668; see *People v. Riccardi*, *supra*, 54 Cal.4th at p. 783.) Thus, regardless of whether defendant suffered any actual prejudice from the dismissal of these panelists, his penalty judgment must be reversed.

B. *Guilt Phase Issues*

1. *Evidence of Uncharged Robberies*

In addition to the charges for which he was later tried and convicted, defendant was initially charged with two other robberies. An amended complaint alleged a robbery of Julio Cube using a knife on January 12, 1993, and a second robbery of Cube on February 14, 1993, using a handgun. Although defendant was ultimately not tried for these robberies, evidence about them was admitted pursuant to Evidence Code section 1101, subdivision (b) (Evidence Code section 1101(b)). The evidence was properly admitted.

a. *Background*

i. *Procedure*

At the preliminary hearing, Cube testified that on January 12 he was working at Jambi 3 Jewelry (Jambi 3) when someone robbed him at knifepoint and took a Walther PPK .380-caliber handgun. Asked who robbed him, Cube stated, "I think it's that guy over there," indicating defendant. He had also selected defendant at a live lineup but stated he was not completely certain because the man in the lineup wore different clothing. When questioned by the magistrate, Cube admitted that he picked defendant at the lineup because he looked like the person who had robbed him "the second time." Cube explained that he had been robbed a second time, about a month later, by the same person. He did not file a police report because nothing significant had been taken and he was afraid.

The magistrate rejected the Jambi 3 robbery counts "based on insufficient identification by Mr. Cube and his confusion and nonreporting, the fact that there

24

may have been more than one incident, and the court seemed satisfied that Mr. Cube really could not identify the defendant. [¶] He thought so at one point in time and then confused the robberies to the point where I believe he was totally confused in his testimony." Notwithstanding this ruling, the prosecution filed an information that included these charges.

Defendant moved to set aside the information (§ 995). As to the Jambi 3 robberies, he argued the magistrate had made a factual finding of insufficient identification that could not be second-guessed. The prosecutor disagreed with the characterization of the magistrate's ruling as a factual finding and countered that other evidence was sufficient to implicate defendant in the robberies. In particular, a gun stolen from Cube in the first robbery was used in several of the other robberies and ultimately found in defendant's possession. The motions judge agreed the presence of Cube's gun in defendant's car was "awfully coincidental." Nevertheless, she granted the section 995 motion as to the Jambi 3 robberies because she concluded the magistrate made a factual finding that defendant had not been sufficiently identified as the perpetrator.

Before trial, the prosecutor indicated that she intended to call Julio Cube to testify about the Jambi 3 robberies and the stolen gun. Based on the section 995 ruling, defense counsel argued the magistrate had made a factual finding that Cube's identification of defendant was not believable. He moved to exclude evidence of the Jambi 3 robberies under Evidence Code section 352 because Cube's identification was questionable and fairness should prevent the prosecution from presenting evidence of crimes it is prohibited from charging. The court concluded the magistrate had made a legal ruling, not a factual finding, when it determined there was an insufficient identification to hold defendant to answer on the Jambi 3 counts. In any event, even if it were a factual finding that would preclude *refiling* of the charges, such a finding would not bar evidence offered under Evidence Code section 1101(b). The court then found the evidence

25

admissible under Evidence Code section 1101(b) to show intent or a common plan. (See *People v. Ewoldt* (1994) 7 Cal.4th 380 (*Ewoldt*).)

ii.      *Trial Testimony*

Cube testified that Jambi 3 was a family business. On January 12, 1993, a man walked in, came around the counter, pushed a knife into Cube's stomach, and demanded money. When he ordered Cube to open the register, Cube complied, handing him the bills inside. The man then pushed Cube toward the safe and ordered him to open it. The safe contained a Walther handgun owned by Cube's brother. The man took the gun and placed it in his waistband. He then ordered Cube to get on the floor. When Cube heard him leave, he called 911.

The store was robbed a second time on February 14, 1993. Once again, Cube was alone. He was closing the store when a Black man came to the door with some jewelry. When Cube unlocked the door, a second man pushed him back and held a gun to his neck. Cube opened the register. The second man grabbed the money and left.

Cube believed the same man robbed him both times because his voice was the same. He picked defendant from a photo lineup but later said he was only 10 to 25 percent certain. He selected defendant at a live lineup but was not completely certain due to fear and the passage of time. Cube identified defendant at trial as his robber.

b.      *Authority to Admit Evidence of Dismissed Charges*

Defendant's opening brief on appeal argued Cube's testimony was inadmissible under Evidence Code section 1101(b). In supplemental briefing, he raised additional arguments challenging the court's authority to admit testimony about charges dismissed in preliminary proceedings.

Defendant disputes the trial judge's conclusion that the magistrate made a legal conclusion as to the sufficiency of evidence for the robberies rather than a factual finding that Cube could not identify defendant as the perpetrator. Absent authority, he contends the court "violated principles of comity" by making an

evidentiary ruling inconsistent with previous rulings by other judges.  Defendant also asserts that when the prosecution cannot meet the very low burden of proving a crime at the preliminary hearing, evidence of that crime should be inadmissible at trial.

A magistrate's material factual findings are binding on the superior court considering a section 995 motion; however, the prosecution may challenge the magistrate's legal conclusion that the evidence was insufficient to show that the charged offense occurred.  (*Pizano v. Superior Court* (1978) 21 Cal.3d 128, 133; *Jones v. Superior Court* (1971) 4 Cal.3d 660, 666.)  Regardless of whether the magistrate's findings here were factual or legal in nature, they were clearly honored.  The two charges were dismissed under section 995.  No prosecution ensued.  Moreover, as defendant concedes, the magistrate's ruling had no collateral estoppel effect on the trial judge's evidentiary ruling.  The magistrate and motions judge decided whether sufficient evidence had been presented to hold defendant for trial on the robberies.  A different issue was before the trial judge: whether testimony about the robberies was admissible under Evidence Code section 1101(b).

Defendant's complaint about inconsistency in the rulings is unavailing for similar reasons.  It was not inconsistent for the trial court to reach a different conclusion in answering a different question.  Moreover, to the extent defendant suggests double jeopardy principles prohibit the prosecution from relying on evidence of dismissed charges, it is important to note that defendant faced no additional jeopardy for robbing Cube.  (See *Serfass v. U. S.* (1975) 420 U.S. 377, 391-392.)

Defendant is correct that the prosecution's burden of proof at the preliminary hearing was lower than its burden to prove those acts at trial.  At a preliminary hearing, the magistrate determines only whether probable cause exists.  That is, could a reasonable person "harbor a *strong suspicion* of the defendant's guilt"?  (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 251-252, italics added.)

27

By contrast, a jury may properly *consider* Evidence Code section 1101(b) evidence only if the conduct has been proven by a preponderance of the evidence. (CALJIC No. 2.50.1; *People v. Carpenter* (1997) 15 Cal.4th 312, 381-382.)  But these different standards of proof do not mean charges dismissed by a magistrate can never be considered by a jury.  The jury is a new fact finder, and its view of the evidence is not constrained by the view of a judge considering a different question.  If the jury does not find that the other crimes have been proven by a preponderance of the evidence, it must disregard them.  (*Carpenter*, at p. 382.)  It may rely on that evidence to *convict* only if it concludes the other crimes were proven beyond a reasonable doubt.  (See *People v. Watson* (1956) 46 Cal.2d 818, 831-832; CALCRIM No. 224 (Spring 2014).)

Accordingly, the trial judge did not err in concluding the Jambi 3 robberies could be admissible as Evidence Code section 1101(b) evidence despite the dismissal of these charges at the preliminary hearing.

   c. *Admissibility Under Evidence Code Section 1101(b)*

Defendant also contends the evidence did not satisfy Evidence Code section 1101(b).  "Character evidence, sometimes described as evidence of propensity or disposition to engage in a specific conduct, is generally inadmissible to prove a person's conduct on a specified occasion. (Evid. Code, § 1101, subd. (a).)  Evidence that a person committed a crime, civil wrong, or other act may be admitted, however, not to prove a person's predisposition to commit such an act, but rather to prove some other material fact, such as that person's intent or identity. (*Id.*, § 1101, subd. (b).)  We review the trial court's decision whether to admit evidence, including evidence of the commission of other crimes, for abuse of discretion." (*People v. Harris* (2013) 57 Cal.4th 804, 841.)

Cases sometimes describe Evidence Code section 1101(b) evidence as "prior offenses" or "prior bad acts."  Both shorthand formulations are imprecise. Evidence Code section 1101(b) authorizes the admission of "a crime, civil wrong, *or other act*" to prove something other than the defendant's character.  (Italics

28

added.)  The conduct admitted under Evidence Code section 1101(b) need not have been prosecuted as a crime, nor is a conviction required.  (See, e.g., *People v. Garcia* (1995) 41 Cal.App.4th 1832, 1849, disapproved on another ground in *People v. Sanchez* (2001) 24 Cal.4th 983, 991, fn. 3.)  The conduct may also have occurred after the charged events, so long as the other requirements for admissibility are met.  (See *People v. Balcom* (1994) 7 Cal.4th 414, 425.)  Specifically, the uncharged act must be relevant to prove a fact at issue (Evid. Code, § 210), and its admission must not be unduly prejudicial, confusing, or time consuming (Evid. Code, § 352).

The relevance depends, in part, on whether the act is sufficiently similar to the current charges to support a rational inference of intent, common design, identity, or other material fact.  (*People v. Kipp* (1998) 18 Cal.4th 349, 369.)  "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent.  [Citation.]  . . .  In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" (*Ewoldt*, *supra*, 7 Cal.4th at p. 402.)  Greater similarity is required to prove the existence of a common design or plan.  In such a case, evidence of uncharged misconduct must demonstrate " 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' [Citation.]" (*Ibid*.)  To show a common design, "evidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts." (*Id*. at p. 403.)  Finally, the greatest similarity is required to prove identity.  When offered on this point, "the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that

the same person committed both acts." (*Ibid.*)  These common features need not be unique or nearly unique; "features of substantial but lesser distinctiveness may yield a distinctive combination when considered together." (*People v. Scott* (2011) 52 Cal.4th 452, 473.)

The Jambi 3 robberies were sufficiently similar to the charged crimes to show that defendant acted with both the same intent and a common plan.  The store was a small retail establishment located in the same general neighborhood as the other small stores defendant and his companions robbed.  The first Jambi 3 robbery occurred two days before the robbery at the Hollywood Shell station, during which defendant held a gun to cashier David Su's neck.  The Walther handgun stolen from the Jambi 3 safe was used to commit the robberies and murders at Jack's Liquor and the Sun Valley Shell.  It was found in the car defendant was driving when arrested.  The second Jambi 3 robbery occurred three days after defendant robbed the Seven Star Motel and three days before he committed a series of four other robberies in two hours (Original Blooming Design, Rocky's Video, Nice Price Store, and Valley Market).  Defendant argues these robberies were not distinctive.  Yet, "[u]nlike evidence of uncharged acts used to prove identity, [a common] plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense." (*Ewoldt*, *supra*, 7 Cal.4th at p. 403; see *People v. Balcom*, *supra*, 7 Cal.4th at p. 424.)

Relying on a civil case, *Hassoldt v. Patrick Media Group, Inc.* (2000) 84 Cal.App.4th 153, defendant also contends the evidence was inadmissible to prove intent or common design because the identity of the person who committed the Jambi 3 robberies was not established.  We have repeatedly rejected this argument. (*People v. Rogers* (2013) 57 Cal.4th 296, 330-331; *People v. Foster* (2010) 50 Cal.4th 1301, 1332.)  The threshold *admissibility* of uncharged crimes evidence does not require proof that the defendant was the perpetrator in both sets of offenses.  As we explained in *People v. Soper* (2009) 45 Cal.4th 759, 778, "a fact

30

finder properly may consider [section 1101(b)] evidence to prove intent, so long as (1) the evidence is sufficient to sustain a finding that the defendant committed both sets of crimes [citation], and further (2) . . . 'the factual similarities . . . tend to demonstrate that in each instance the perpetrator harbored' the requisite intent. [Citation.] There is no requirement that it must be conceded, or a court must be able to assume, that the defendant was the perpetrator in both sets of offenses." Here, the jury was able to hear and evaluate Cube's testimony and the accuracy of his identification of defendant. If they found that evidence lacking, they could not rely on it in determining defendant's guilt of the charged offenses.

A second consideration is the question of undue prejudice, time consumption, or confusion. "If evidence of prior conduct is sufficiently similar to the charged crimes to be relevant to prove the defendant's intent, common plan, or identity, the trial court then must consider whether the probative value of the evidence 'is "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)' (*Ewoldt*, *supra*, 7 Cal.4th at p. 404.)" (*People v. Foster*, *supra*, 50 Cal.4th at p. 1328.) The court did not abuse its discretion in concluding the probative value of the Jambi 3 robberies was not outweighed by the substantial danger of undue prejudice. The probative value of these crimes was high because they showed defendant committed the charged crimes according to the same plan and using the same weapon. Julio Cube's testimony was also relevant to show how defendant obtained the handgun he used in the two charged murders. In contrast to these murders, and the other charged crimes, evidence of the Jambi 3 robberies was not particularly inflammatory. (See *Ewoldt*, at p. 405.) Cube's testimony was straightforward and occasioned no substantial consumption of time. Moreover, any juror confusion was unlikely because the court instructed that the uncharged crimes could be considered only

31

for the limited purpose of proving defendant acted with a common design or possessed the means for committing the charged crimes.[11]

2. *Lay Opinion Identification*

Defendant claims the trial court erred when it allowed a detective to identify him as the person shown on the surveillance videos of two robberies. Such a ruling is reviewed for abuse of discretion. (*People v. Mixon* (1982) 129 Cal.App.3d 118, 127.) The claim fails.

During the testimony of Detective Michael Oppelt, the prosecutor played a portion of the surveillance tape from the Valley Market robbery. As the video played, she asked Oppelt whether he recognized the jacket worn by a person who entered the store. Defendant objected that any identification by the detective would be an inadmissible lay opinion. The court allowed the testimony subject to the laying of sufficient foundation that Oppelt had contact with defendant.

Oppelt testified that he was "very" familiar with defendant's appearance. He first saw defendant when he was arrested. He subsequently saw defendant nearly 10 times and spent about two hours with him. Oppelt was also familiar with the jacket defendant wore when arrested. Like the jacket shown in the video, defendant's jacket had colored panels on the sleeves and front pockets with silver

---

[11] The jury was instructed with CALJIC No. 2.50 (1994 rev.) (5th ed. 1988) as follows: "Evidence has been introduced for the purpose of showing that the defendant committed a crime other than that for which he is on trial. [¶] Such evidence, if believed, was not received and may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes. Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show: [¶] A characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case which would further tend to show the existence of the intent which is a necessary element of the crime charged. [¶] The defendant had knowledge or possessed the means that might have been useful or necessary for the commission of the crime charged. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose."

hasps.  In Oppelt's opinion, the person shown in the Valley Market surveillance video was defendant, in the same jacket he was wearing when arrested the next day.

Oppelt also testified about the surveillance video from the Sun Valley Shell station murder.  He said that the car in the video looked like the car defendant crashed when fleeing from police.  The body color, wood paneling, luggage rack, and appearance of the front license plate were all similar.  Oppelt also testified that the jacket and Raiders baseball cap worn by a person in the video looked similar to the jacket defendant wore and the cap found in his car.

A lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony.  (Evid. Code, § 800.)  "[T]he identity of a person is a proper subject of nonexpert opinion . . . ."  (*People v. Perry* (1976) 60 Cal.App.3d 608, 612 (*Perry*); accord, *People v. Mixon*, *supra*, 129 Cal.App.3d at p. 127 (*Mixon*).)

Court of Appeal decisions have long upheld admission of testimony identifying defendants in surveillance footage or photographs.  In *Perry*, the defendant argued an identification had to be based on the officer's perception of a crime.  (*Perry*, *supra*, 60 Cal.App.3d at p. 613.)  The court disagreed, finding it proper for officers to predicate their opinion on "contacts with defendant, their awareness of his physical characteristics on the day of the robbery, and their perception of the film taken of the events."  (*Ibid*.)  The testimony was also helpful because the defendant had changed his appearance by shaving his mustache before trial.  (*Ibid*.)  Similarly, the court in *Mixon*, upheld identification of the defendant in a robbery surveillance photograph by officers who had numerous contacts with him and were unequivocal in their identification.  (*Mixon*, *supra*, 129 Cal.App.3d at pp. 130-131; see also *People v. Ingle* (1986) 178 Cal.App.3d 505, 515 [allowing similar testimony by robbery victim based on her observation of defendant during the crime].)

33

Defendant distinguishes these cases because Oppelt did not have contact with him *before* the crimes. (See *People v. Ingle*, *supra*, 178 Cal.App.3d at p. 513.) This is a distinction without a difference. It is undisputed Oppelt was familiar with defendant's appearance around the time of the crimes. Their contact began when defendant was arrested, one day after the Valley Market robbery. Questions about the extent of Oppelt's familiarity with defendant's appearance went to the weight, not the admissibility, of his testimony. (*Perry*, *supra*, 60 Cal.App.3d at p. 613.) Other eyewitness testimony indicated defendant had changed his appearance after the crimes. Witnesses who identified defendant in lineups held many months after the crimes noted that defendant was heavier, had shorter hair, and no longer wore a mustache. Moreover, because the surveillance video was played for the jury, jurors could make up their own minds about whether the person shown was defendant. Because Oppelt's testimony was based on his relevant personal knowledge and aided the jury, the court did not abuse its discretion by admitting it.

3.      *Autopsy Testimony*

Based on *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and its progeny (see *Williams v. Illinois* (2012) 567 U.S. __ [132 S.Ct. 2221]; *Bullcoming v. New Mexico* (2011) 564 U.S. __ [131 S.Ct. 2705]; *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305), defendant claims his due process and confrontation rights were violated when a medical examiner testified based on an autopsy report and photographs prepared by another examiner.

The autopsy of Norair Akhverdian was conducted by Dr. Wegner of the Los Angeles County coroner's office. Dr. Wegner had died by the time of trial. Dr. Eugene Carpenter, another medical examiner, laid the foundation for five photographs and a diagram accompanying Wegner's report. All were admitted into evidence as business records.

Dr. Carpenter explained what each autopsy photograph depicted. He also recited several of Dr. Wegner's observations and conclusions contained in the

34

report. Dr. Wegner concluded the cause of Akhverdian's death was a gunshot to the abdomen. The bullet entered the lower left front chest and exited at about the same level on the lower right back, injuring the aorta. From his own expertise, Dr. Carpenter explained how a bullet entering at this position could pierce the heart.[12] Dr. Wegner had no access to Akhverdian's clothes and could not make a definitive statement about the range from which he was shot. However, because there were no signs of gunpowder residue on the body, Dr. Wegner concluded the end of the barrel was not closer than two to four feet away.

Defendant did not raise a hearsay objection to this testimony or admission of the documents. Nevertheless, the claim is not forfeited because *Crawford* was decided nearly eight years after defendant's trial. *Crawford* "was a dramatic departure from prior confrontation clause case law" that competent defense counsel could not reasonably have anticipated. (*People v. Harris*, *supra*, 57 Cal.4th at p. 840.) Accordingly, defendant's failure to object based on *Crawford* is excusable. (*People v. Pearson* (2013) 56 Cal.4th 393, 461-462; *People v. Edwards* (2013) 57 Cal.4th 658, 704-705; *Harris*, at p. 840.)

*Crawford* held that the admission of "testimonial" out-of-court statements violates a criminal defendant's confrontation rights unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination (*Crawford*, *supra*, 541 U.S. at p. 68), or waived that right by his own wrongdoing (*Giles v. California* (2008) 554 U.S. 353, 367-368). Although the Supreme Court has not settled on a clear definition of what makes a statement testimonial, we have discerned two requirements. First, "the out-of-court statement must have been made with some degree of formality or solemnity." (*People v. Lopez* (2012) 55 Cal.4th 569, 581.) Second, the primary purpose of the

---

**12** Because the heart sits on the diaphragm, it moves up and down in the chest. Body movements that raise the chest, such as leaning backward, also put the heart in a lower position.

statement must "pertain[] in some fashion to a criminal prosecution." (*Id*. at p. 582; accord, *People v. Dungo* (2012) 55 Cal.4th 608, 619 (*Dungo*).)[13]

The application of these principles to autopsy reports is somewhat complicated. It is clear that the admission of autopsy *photographs*, and competent testimony based on such photographs, does not violate the confrontation clause. Hearsay is defined as an out-of-court "statement." (Evid. Code, § 1200.) A statement is defined for this purpose as an "oral or written verbal expression or . . . nonverbal conduct *of a person*" intended as a substitute for oral or written expression. (Evid. Code, § 225, italics added.) Only people can make hearsay statements; machines cannot. (See *People v. Goldsmith* (2014) 59 Cal.4th 258, 274.) It is also clear that testimony relating the testifying expert's own, independently conceived opinion is not objectionable, even if that opinion is based on inadmissible hearsay. (Evid. Code, § 801, subd. (b); *People v. Montiel* (1993) 5 Cal.4th 877, 918.) A testifying expert can be cross-examined about these opinions. The hearsay problem arises when an expert simply recites portions of a report prepared by someone else, or when such a report is itself admitted into evidence. In that case, out-of-court statements in the report are being offered for their truth. Admission of this hearsay violates the confrontation clause if the report was created with sufficient formality and with the primary purpose of supporting a criminal prosecution. (*Dungo*, *supra*, 55 Cal.4th at p. 619.)

With regard to autopsy reports in particular, a majority of this court has distinguished between statements that set forth anatomical and physiological observations and those that relate the pathologist's conclusions as to cause of death. (*People v. Edwards*, *supra*, 57 Cal.4th at pp. 706-707; *Dungo*, *supra*, 55 Cal.4th at p. 619.) The *Dungo* majority concluded that statements of the first type, which merely record objective facts about a body's condition, are not sufficiently

---

[13]    Most United States Supreme Court cases to date have involved statements made by or to a government investigatory agent. There is no dispute here that, when performing this autopsy, Dr. Wegner was acting as a government agent.

36

formal or litigation related to be testimonial under the high court's precedents. (*Dungo*, at pp. 619-621.) Accordingly, *Dungo* found no confrontation clause violation when a testifying pathologist expressed forensic opinions based on the medical observations in a nontestifying pathologist's autopsy report. (*Id*. at p. 621.) In *Dungo*, the report was not admitted into evidence. Thus, this court had no occasion to decide whether the entire report, which included conclusions as well as observations, was testimonial. (*Id*. at pp. 612, 618-619.)

Here, the autopsy report was admitted. Dr. Wegner's demise rendered him unavailable, and defendant had no prior opportunity to cross-examine him. Wegner's report was signed and certified with the seal of the Los Angeles County coroner's office. Unlike the situation in *Dungo*, here a large portion of Dr. Carpenter's testimony simply recited the observations *and conclusions* contained in Wegner's report.

Assuming the testimony and report were erroneously admitted, however, the error was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24.) The cause of Akhverdian's death was undisputed. Defendant points to no prejudice that could have arisen from an erroneous admission of the report and testimony. He argues only that the case against him was highly circumstantial. The central trial dispute concerned defendant's identity as the shooter, not that Akhverdian was shot to death. Under the circumstances, it is not reasonably possible that admission of the autopsy report or testimony about it could have affected the verdict.

4.      *Prosecutorial Misconduct*

Next, defendant argues the prosecutor committed misconduct by appealing to the passions and emotions of jurors in her guilt phase closing argument. No prejudicial misconduct occurred.

At the outset of her argument, the prosecutor asserted that an "underlying theme" to all of the alleged crimes was "cruel and unnecessary violence." Her point was that in many of the crimes defendant and his accomplices went further

37

than was necessary to complete the robberies. Instead, they used excessive violence to harm and terrify their victims. The prosecutor began with the Jambi 3 robbery, noting that victim Julio Cube had a "disfigured" hand, stood five feet four inches tall, and weighed about 110 pounds. "And the robber came back twice, once sticking a knife in his belly . . . , and the other time sticking a gun in his neck." Defense counsel objected that the level of violence was not relevant to any element of guilt and thus improperly appealed to passion. The objection was overruled.

The prosecutor then offered several additional examples of excessive violence and cruelty. She noted that two of the victims were "women working alone," and the robbers took money from their purses as well as from the businesses. She noted the "impatien[ce]" of the H&R Pawnshop robbers and asked rhetorically whether it was necessary for the robbers to use so much force and violence. She made the same point with respect to the Chan's Shell station and Valley Market robberies, observing this was "a very assaultive robber." He did not simply show his gun or demand money. Instead, "you see him reaching over, pointing at these people, gesturing, posturing with such arrogance, with such arrogance he robs these people." Later in the argument, she observed that in the surveillance videos defendant appeared to have "an attitude, a strut about him as he robs people." With this "excessive" behavior, defendant "turn[ed] what could be a rather routine robbery into a very frightening and intimidating experience" for the victims. The murder of Varouj Armenian in the Jack's Liquor robbery was especially cruel, the prosecutor argued, because the victim was shot in the back.

Finally, the prosecutor discussed the "very pathetic videotape" of Norair Akhverdian's murder at the Sun Valley Shell station. She argued: "Here is a guy who is doing everything right. If you were to give classes on what happens if a robber comes in, you would say whatever you do don't fight the guy, don't make any moves, don't scare him. And you see Mr. Akhverdian on this videotape. . . . [Y]ou can tell from looking at his arms and hands he is holding them down. . . .

38

He is not interfering at all with the movement of the money.  And this guy, see how pathetic this is, this guy stands there and he is probably thinking okay, it's over.  I have done things right.  The robber is leaving, . . . and he turns and he shoots this man. . . .  [¶] What could Mr. Akhverdian have done to cause a person to do that?"

Defendant now complains these comments were inappropriate for a guilt phase argument.  "Improper comments by a prosecutor require reversal of a resulting conviction when those comments so infect a trial with unfairness that they create a denial of due process.  [Citations.]  Conduct by a prosecutor that does not reach that level nevertheless constitutes misconduct under state law, but only if it involves the use of deceptive or reprehensible methods to persuade the court or jury." (*People v. Watkins* (2012) 55 Cal.4th 999, 1031.)

Nearly all of the challenged statements fell within the permissible bounds of argument.  All of the remarks about the defendant's arrogant attitude, and the excessive violence used in committing the robberies, were tied to specific evidence.  The prosecution's theory was that defendant was the same man involved in each incident.  She was entitled to argue that the robber acted similarly each time.  " 'It is, of course, improper to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." [Citation.]' [Citation.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1210.)  However, prosecutors have wide latitude to present vigorous arguments so long as they are a fair comment on the evidence, including reasonable inferences and deductions from it.  (*People v. Hill* (1998) 17 Cal.4th 800, 819.)  The prosecutor's argument here was based on photographs and testimony.  It did not overtly encourage jurors to base their verdicts on passion or emotion.

Crimes of violence and intimidation are almost always upsetting.  Discussing the manner in which they are committed is fair comment.  There is no

requirement that crimes of violence be described dispassionately or with philosophic detachment. "Prosecutors 'are allowed a wide range of descriptive comment and the use of epithets which are reasonably warranted by the evidence' [citation], as long as the comments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury [citation]." (*People v. Farnam* (2002) 28 Cal.4th 107, 168.) The challenged statements here were acceptable as fair comment on the evidence. (See *ibid*.)

Somewhat more problematic was the portion of the prosecutor's argument concerning Norair Akhverdian's murder. "As a general rule, a prosecutor may not invite the jury to view the case through the victim's eyes, because to do so appeals to the jury's sympathy for the victim." (*People v. Leonard* (2007) 40 Cal.4th 1370, 1406.) It is also improper to ask jurors to imagine the victim's thoughts during the last seconds of life. (*Id.* at p. 1407; *People v. Stansbury* (1993) 4 Cal.4th 1017, 1057.) Defendant contends the prosecutor's discussion of Akhverdian's robbery and murder constituted such impermissible argument. Unlike arguments condemned in other cases, however, the prosecutor here did not invite the jury to place themselves in Akhverdian's shoes or to imagine his suffering. Rather, she directed their attention to Akhverdian's behavior in the surveillance video to point out how he was callously shot in the back *after* the robbery was completed and despite his complete submission and compliance with the robber's demands. She speculated that Akhverdian may have thought the robbery was over when defendant turned to leave, but this brief observation was fair comment on the evidence and not so deceptive or unfair as to constitute misconduct under state or federal law. (See *People v. Watkins*, *supra*, 55 Cal.4th at p. 1031; cf. *People v. Vance* (2010) 188 Cal.App.4th 1182, 1194 [prosecutor committed misconduct in telling jurors it was their duty to " 'relive' " all of suffocation victim's last feelings and describing them in graphic detail].) Moreover, any error was clearly harmless, since the evidence of defendant's guilt was overwhelming.

5. *Flight Instruction*

Defendant claims it was error for the court to give CALJIC No. 2.52, concerning the significance of flight after crime,[14] and this error violated his rights under the Sixth, Eighth, and Fourteenth Amendments and their state constitutional counterparts. The instruction was proper.

"In general, a flight instruction 'is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt.' [Citations.] ' "[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested." ' [Citation.]" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.)

Defense counsel argued the evidence did not support a flight instruction because his flight from the police was too far removed from the alleged robberies. However, "the instruction neither requires knowledge on a defendant's part that criminal charges have been filed, nor a defined temporal period within which the flight must be commenced . . . ." (*People v. Carter* (2005) 36 Cal.4th 1114, 1182.) This court has held that flight is relevant to show consciousness of guilt even when the flight occurred four weeks after a murder. (*People v. Mason* (1991) 52 Cal.3d 909, 941-942.) Here, defendant tried to evade the police in a high-speed car chase just one day after he participated in the last robberies of his nearly month-long crime spree, which included two homicides. " 'Common sense . . . suggests that a guilty person does not lose the desire to avoid apprehension for offenses as grave as multiple murder[] after only a few' days. [Citation.]" (*People v. Loker* (2008)

---

**14** CALJIC No. 2.52, as given here, states: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

41

44 Cal.4th 691, 706.) Moreover, the instruction does not require the jury to find that flight occurred or rely on flight as proof of guilty intent. It simply says that flight "*may* be considered" "*if proved*." (CALJIC No. 2.52, italics added.) The evidence amply supported the giving of a flight instruction.

On appeal, defendant now contends CALJIC No. 2.52 unnecessarily duplicated the circumstantial evidence instructions, was impermissibly argumentative, and improperly permitted the jury to draw irrational inferences about his mental state. We have previously rejected all of these challenges. "CALJIC Nos. 2.00, 2.01, and 2.02 instructed on the definition of circumstantial evidence and its sufficiency in establishing facts to establish guilt. On the other hand, CALJIC No. 2.52 was a cautionary instruction that benefitted the defense by 'admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory.' [Citation.]" (*People v. Streeter* (2012) 54 Cal.4th 205, 254.) Nor is the instruction argumentative or irrational. (*People v. Loker*, *supra*, 44 Cal.4th at p. 707; see *People v. Rogers*, *supra*, 57 Cal.4th at p. 333; *People v. Boyette* (2002) 29 Cal.4th 381, 438.)

C.    *Penalty Phase Issues*

Defendant raises several claims of error at the penalty phase. Because we have determined the penalty judgment must be reversed for *Witherspoon/Witt* error, we need not reach these claims. (See *People v. Riccardi*, *supra*, 54 Cal.4th at p. 839.) For the same reason, we also do not address defendant's argument that the cumulative effect of errors at the guilt and penalty phases undermined fundamental fairness and violated Eighth Amendment standards of reliability.

42

## DISPOSITION

The judgment of death is reversed and the matter remanded for a new penalty determination.  In all other respects, the judgment is affirmed.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**KRUGER, J.**

**CONCURRING OPINION BY LIU, J.**


Today's opinion reverses the penalty verdict because the trial court erred under *Wainwright v. Witt* (1985) 469 U.S. 412 in dismissing several jurors for cause. Thus, the court's rejection of defendant's penalty-related claims that the trial court erred in denying his motion to add questions to the questionnaire and in truncating voir dire (maj. opn., *ante*, at pp. 11–18) is dicta, and I do not join those portions of today's opinion. In all other respects, I concur.

$\qquad\qquad\qquad\qquad\qquad\qquad\qquad$ **LIU, J.**


**I CONCUR:**

**CUÉLLAR, J.**

1

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Leon

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S056766
**Date Filed:** June 29, 2015

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Ronald S. Coen


_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Alison Pease and Mary McComb, Deputy State Public Defenders, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Keith H. Borjon, Joseph P. Lee and Stacy S. Schwartz, Deputy Attorneys General, for Plaintiff and Respondent.

1

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Mary K. McComb
Deputy State Public Defender
770 L Street, Suite 1000
Sacramento, CA  95814
(916) 322-2676

Stacy S. Schwartz
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2252