Filed 9/24/20  P. v. Graham CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br>        Plaintiff and Respondent,<br><br>v.<br><br>JESSE JAMES GRAHAM,<br>        Defendant and Appellant. | A158222<br><br>(Sonoma County Super.<br> Ct. No. SCR7222691) |

Jesse James Graham appeals from his conviction after a jury trial for stabbing a woman we shall refer to as Jane Doe, who lived in Santa Rosa, a block from where Graham stayed with his mother.  Graham claims his trial counsel provided ineffective assistance by not objecting to lay person opinion testimony by two witnesses identifying him on surveillance video recordings taken on the night of the incident.  We disagree and affirm.

### BACKGROUND

In a February 2019 information, the Sonoma County District Attorney charged Graham with felony assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)) and alleged that he personally inflicted great bodily injury (*id.*, § 12022.7, subd. (a)).  A jury trial followed.

1

# I.

## *The Attack on Jane Doe*

Doe testified through an interpreter that she left work at about 11:30 p.m. on November 20, 2018, and drove home to her apartment on Jennings Avenue. She pulled into her parking lot space about nine yards from her apartment and went to the lighted area in front of her door to open it, but her key would not work. She heard footsteps behind her, turned and saw Graham about three or four feet away dressed in a black cap, his face covered below his nose. She was positive it was Graham; he stood out because of his facial tattoos and tall, thin stature. She had seen him twice before at a local gym but had never spoken to him. He stabbed her in the left side of her back with a shiny silver knife, and she yelled. He left, and she sought help from neighbors. Later that night, she had surgery at a local hospital for a perforated lung. In the early morning following her surgery, she spoke to a Detective DeLeon. She "was badly hurt," in a lot of pain, tired, and "did not know what was going on." Nonetheless, she remembered more and more about the attack as she spoke to him. As a result of the attack, her body was scarred and she had to use a cane to move around.

Two Santa Rosa police officers testified that they went to Doe's apartment complex shortly after 11:40 p.m. on November 20, 2018, to investigate a stabbing incident. Doe was there, crying and screaming in pain. Her daughter, acting as translator for Doe, said a man whose identity Doe did not know had stabbed Doe in the back. The officers found blood drops in front of and on the threshold of her apartment door, which was well lit, and found no witnesses to the incident.

Detective Hector DeLeon of the Santa Rosa Police Department testified that he interviewed Doe briefly in a hospital intensive care unit at about

2

10 a.m. on the morning after the incident.  She appeared to be uncomfortable and in pain, was able to answer all of his questions at first but then seemed to "get real tired," so he stopped the interview.  She said she had seen a knife during the attack and that part of her attacker's face had been uncovered.  Asked if her attacker had any distinguishing features, she said "no or she couldn't remember any" (DeLeon could not remember which).  Upon further questioning, she said "he had a thin face," and was "a very tall, thin man with something covering his face."  Asked about people in her life that she could have interacted with and if she had enemies, Doe told DeLeon about a man at her gym she was afraid of who had facial and arm tattoos, and said that she could "possibly identify the suspect, but she wasn't certain."  DeLeon said nothing to Doe to suggest her attacker was thin or had tattoos on his face or arms.

## II.

### *The Identifications of Graham in Surveillance Videos*

### A. The Manager of Doe's Apartment Complex

The manager of the apartment complex at 1090 Jennings (the manager), where Doe lived, testified that shortly after midnight on the night of the incident officers contacted him, and that together they viewed surveillance video recordings taken at the complex that night.  The manager provided police with footage from around 11:38 p.m.  That surveillance video of the attack on Doe was shown to the jury, and the manager identified Graham as the person in the video stabbing Doe.  He testified that when he watched the video with police, he identified Graham in "less than a second" based on his observations of Graham before the attack.  He had seen Graham three or four times a week, either around the apartment complex or at a nearby gym where the manager regularly worked out, and he had spoken to

3

Graham. The manager told an officer that night that Graham was tall, skinny, "always at the gym" and lived in a nearby apartment complex. A few hours later, he identified Graham from a photo lineup, telling police he was "one hundred percent positive" about his identification.

Along with indicating that Graham was tall and thin, the manager testified that Graham had visible tattoos, a "wavy, shaky" walk and stared at people. Asked if there was any difference between how Graham looked at trial and how he looked at the time of the incident, the manager testified that Graham looked much younger and skinnier" and had shorter hair at the time of the incident (though he used to always wear a hoodie), as compared to his appearance at trial.

### B. The Manager of the Apartment Complex Where Graham Stayed

The manager of the seniors-only apartment complex where Graham stayed with his mother, located at 1080 Jennings, about a block from Doe's complex, also testified (senior apartment manager). She said Graham's mother had lived in a second-floor apartment at the complex for a number of years and that she, the senior apartment manager, had seen Graham "hundreds and hundreds of times over the years." He was at the complex "basically every single day" and stayed with his mother often, even though the complex's rules limited visitors to two-week stays every six months. Graham also sometimes stayed overnight in his mother's van, parked in either the complex's parking lot or on the street.

The senior apartment manager further testified that she gave the police some surveillance video from the apartment complex that was recorded on the night of the incident. The footage was played for the jury; the prosecutor stopped it at "114055392" and asked the manager what it depicted. The manager was "positive" that it depicted Graham being let into

4

the apartment complex building.  The manager also said she had not seen anyone else as tall as Graham or with facial tattoos at the apartment complex.

The senior apartments manager was also shown the surveillance video of the attack on Doe.  She was "positive" that Graham was the attacker, noticing the video depicted his "very distinct" "kind of a swagger or slash awkward walk" and his tennis shoes.  She also noted that Graham was "very tall" and "[f]airly slender, lanky."

### C.  Graham's Mother

Graham's mother testified that Graham could come to her apartment daily and sometimes slept there or in her vehicle.  She could not tell if the person in the surveillance video of her apartment complex was Graham or if she let the person into the building, but she agreed the person was tall and wore clothes like her son's.  She could not identify the person in the video of the attack on Doe.  She said she paid for Graham's memberships at two nearby gyms, and that the clothing in a shopping bag seized by police when they arrested Graham contained three items of clothing Graham had asked her to wash.  She was home with him for at least part of the day of the incident and could not recall if they had dinner together.  Asked if she told police Graham went out twice that evening, she said he went out once early that evening and could not recall the exact time.

### III.

### *Graham's Arrest and Interrogation*

The morning after the incident, November 21, 2018, police surveilled the senior apartment complex at 1080 Jennings.  Before noon, Graham and his mother, who was carrying a shopping bag, came out of the building and walked to his mother's vehicle in the parking lot, and his mother placed her

5

bag in the vehicle's trunk. Officers took Graham into custody. They found two shirts and a camouflage hat in the shopping bag and no other clothing in the trunk. Pursuant to a warrant, police searched the mother's apartment, where they found other clothing of Graham's and a steel-colored, sharp-tipped kitchen knife tucked away in a chair.

DeLeon interrogated Graham the day he was taken into custody. DeLeon told Graham the police were investigating something serious that happened in an apartment complex. Graham said he was at his mother's apartment on night of the incident and did not leave it until the next morning. DeLeon told Graham there were surveillance systems at his mother's apartment complex and others nearby, and asked Graham what had happened after he left his house the night before. Graham responded, " 'well, I saw the lady and I thought she was the lady who called me a faggot earlier.' " Asked what he did, he said, " 'probably why you guys—probably why you guys picked me up. And—and—and I just got—I just got mad and that's it.' "

A video of the interrogation was played for the jury. A transcript of the interrogation contained in the record indicates Graham made statements consistent with DeLeon's testimony. Graham also said he was six feet, five inches tall and weighed about 200 pounds, gave his mother's apartment as his address, and indicated that he was 40 years old, volunteered at a tattoo shop and received social security for anxiety.

At trial, DeLeon identified photographs of Graham taken on the day of the interview and clothing that was taken from Graham that day. The photographs show Graham's face covered with extensive tattoos, both below and above his nose, and show him wearing tennis shoes. DeLeon testified

6

that spots on Graham's clothes were tested to determine if they were blood and they were not.

The jury deliberated for a little over two days. At some point on the last day, the jury foreperson told the court that after three ballots the jury was "pretty strongly deadlocked" 11 to 1 on what constituted reasonable doubt and that the foreperson did not think it was reasonably probable the jury would reach a unanimous verdict with further deliberations. The court then polled each juror. Four indicated it was possible the jury could reach a verdict with further deliberations, four were not sure and four did not think it was possible. Because the responses of eight of the jurors did not preclude the possibility that the jury could reach a verdict, the court instructed the jurors again on reasonable doubt and ordered them to return at 1:30 p.m. and continue deliberations. That afternoon, the jury found Graham guilty of assault with a deadly weapon and found the serious bodily injury allegation to be true.

The court sentenced Graham to seven years in prison, consisting of the upper term of four years for felony assault with a deadly weapon and three years for causing great bodily injury. Graham filed a timely notice of appeal.

## DISCUSSION

Graham argues his trial counsel provided ineffective assistance in violation of his constitutional right to effective representation under *People v. Ledesma* (1987) 43 Cal.3d 171 and *Strickland v. Washington* (1984) 466 U.S. 668 by failing to object to the two apartment managers' opinion testimony that he was the person depicted in the surveillance videos recorded at 1080 and 1090 Jennings on the night of the incident. He is wrong. Counsel acted competently because any objection would very likely have been overruled as the testimony was plainly admissible.

"To prevail on a claim of ineffective assistance of counsel, the defendant must show counsel's performance fell below a standard of reasonable competence, and that prejudice resulted. [Citations.] When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation. [Citation.] Even where deficient performance appears, the conviction must be upheld unless the defendant demonstrates prejudice, i.e., that, ' " 'but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' " (*People v. Anderson* (2001) 25 Cal.4th 543, 569.)

Evidence Code section 800 states, "If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony." In *People v. Leon* (2015) 61 Cal.4th 569 (*Leon*), our Supreme Court held " '[T]he identity of a person is a proper subject of nonexpert opinion . . . .' " (*Id.* at p. 601.) The court observed, "Court of Appeal decisions have long upheld admission of testimony identifying defendants in surveillance footage or photographs. In [*People v.*] *Perry* [(1976) 60 Cal.App.3d 608], the defendant argued an identification had to be based on the officer's perception of a crime. (*Perry*, *supra*, 60 Cal.App.3d at p. 613.) The court disagreed, finding it proper for officers to predicate their opinion on 'contacts with defendant, their awareness of his physical characteristics on the day of the robbery, and their perception of the film taken of the events.' (*Ibid.*) The testimony was also helpful because the defendant had changed his appearance by shaving his mustache before trial.

8

(*Ibid.*)  Similarly, the court in [*People v.*] *Mixon* [(1982) 129 Cal.App.3d 118] upheld identification of the defendant in a robbery surveillance photograph by officers who had numerous contacts with him and were unequivocal in their identification.  (*Mixon, supra*, 129 Cal.App.3d at pp. 130-131; see *People v. Ingle* (1986) 178 Cal.App.3d 505, 514 [allowing similar testimony by robbery victim based on her observation of defendant during the crime].)" (*Id.* at p. 600 [upholding the admissibility of the lay opinion of a detective who was " 'very' familiar with defendant's appearance" from observations made at the time of defendant's arrest that the person depicted in surveillance videos was defendant].)

Here, the challenged opinion testimony satisfied the requirements of Evidence Code section 800, and its admission was consistent with *Leon*.  The two apartment managers rationally based their opinions on their own prior perceptions of Graham.  Each testified that prior to the incident he or she had seen Graham on numerous occasions and observed key aspects of his appearance, such as his height, thinness, tattoos and distinctive gait.  From their testimony, it is apparent that both were very familiar with his appearance.

As for whether the apartment managers' opinions were helpful at trial, Graham asserts that "nothing in the record suggests that these apartment managers were any better equipped to identify the individual in the videos than were the jurors themselves" and that "[t]here was no suggestion that Graham had changed his appearance between the incident and the trial." These assertions ignore the testimony of the manager of 1090 Jennings that Graham "looked much younger and skinnier" and had shorter hair at the time of the incident, as compared to his appearance at trial.  As indicated in *Leon* and the cases it cites, nothing more was needed to establish the

9

admissibility of the apartment managers' testimony that Graham was the person depicted in the surveillance videos.  In view of these cases, Graham's counsel had  ample reason not to object.

In short, Graham's ineffective assistance claim lacks merit.  Having rejected the claim on its merits, we need not address his argument that he was prejudiced.

## DISPOSITION

The judgment is affirmed.

_____
                    STEWART, J.

We concur.


_____
KLINE, P.J.


_____
RICHMAN, J.


*People v. Graham* (A158222)

11