Filed 2/4/21  P. v. Ortiz CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MANUEL ORTIZ, JR.,<br><br>    Defendant and Appellant. | B302347<br><br>Los Angeles County<br>Super. Ct. No. BA467237 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Leslie A. Swain, Judge. Affirmed.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr., and Stacy S. Schwartz, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant Manuel Ortiz, Jr., was convicted of murder after stabbing a fellow passenger on a city bus. On appeal, he argues that the court erred by admitting law enforcement testimony identifying him in a surveillance video, by admitting confusing DNA evidence, and by imposing fines and fees without determining his ability to pay them.[1] We affirm.

## BACKGROUND

The morning of April 9, 2018, defendant, carrying a blue bag, boarded a Montebello bus. When the bus arrived at one of its stops, defendant started stabbing another passenger in the head. Defendant fled the bus but left the blue bag behind. The victim, later identified as Austin Angelo Zavala, died from his wounds.

Several of defendant's fellow passengers later identified him as the attacker from six-pack photo arrays. A mobile phone recovered from defendant at the time of his arrest was found to have used cell towers, around the time of the stabbing, within a mile of the attack. DNA samples recovered from the blue bag and its contents contained DNA from a mixture of individuals, including defendant. Fingerprints from a toothpaste box inside the bag matched defendant's.

By information dated March 6, 2019, defendant was charged with one count of murder (Pen. Code,[2] § 187, subd. (a); count 1) with a knife (§ 12022, subd. (b)(1)). The information also

---

[1] Because we conclude the court did not err, we do not address defendant's claim of cumulative error.

[2] All undesignated statutory references are to the Penal Code.

alleged four prison priors (§ 667.5, subd. (b)). Defendant pled not guilty and denied the allegations.

After a jury trial at which he did not testify, the jury found defendant guilty of count 1 and found the weapon allegation to be true. Defendant admitted the prison priors and the court found them to be true.

The court sentenced defendant to an indeterminate term of 26 years to life—25 years to life for count 1 plus one year for the deadly-weapon enhancement. The court struck the prison priors.

Defendant filed a timely notice of appeal.

## DISCUSSION

Defendant argues that the court erred by (1) allowing the investigating officer to testify that defendant was the person in various surveillance videos, (2) admitting unduly confusing DNA evidence, (3) and imposing required court costs at sentencing without determining whether defendant had the ability to pay them.

### 1.    Detective Ruggerio's Testimony

During his testimony, Los Angeles Sheriff's Department Detective Timothy Ruggerio, the investigating officer in the case, testified about images in several surveillance videos that were played for the jury. Although Ruggerio often referred to the person in the videos only as "the suspect," he also identified that suspect as defendant numerous times—usually at the prompting of the prosecutor. Defendant argues that the court erred in allowing Ruggerio to identify him as the person in the surveillance videos because Ruggerio had no more insight into that question than the jury. We disagree.

3

### 1.1. Defendant forfeited this issue by failing to object.

The rules of evidence are not self-executing. We may not reverse a judgment or verdict based on "the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion[.]" (Evid. Code, § 353, subd. (a).) This rule exists to give the trial court a concrete legal proposition to pass on, to allow the proponent of the evidence an opportunity to cure the defect, and to prevent abuse. (*People v. Partida* (2005) 37 Cal.4th 428, 434.)

Defendant concedes that although trial counsel objected to Ruggerio's identification testimony at both the beginning and the end of direct examination—and the court sustained those objections—she did not object to the myriad other identifications, thereby forfeiting his challenge on appeal. Notwithstanding the forfeiture, we exercise our discretion to consider the merits of defendant's claim to forestall a later habeas petition on this issue. (See *People v. Williams* (1998) 17 Cal.4th 148, 161–162, fn. 6.)

### 1.2. The testimony was properly admitted.

Lay opinion testimony is admissible if it is both rationally based on the perception of the witness and helpful to a clear understanding of the witness's testimony. (Evid. Code, § 800.) As relevant here, a person who did not witness a crime may identify a defendant from photographs and surveillance videos if the person has personal knowledge of the defendant's appearance and the testimony will assist the trier of fact in resolving the identity issue. (*People v. Leon* (2015) 61 Cal.4th 569, 600–601 (*Leon*); *People v. Ingle* (1986) 178 Cal.App.3d 505, 513 (*Ingle*);

4

*People v. Mixon* (1982) 129 Cal.App.3d 118, 128 (*Mixon*); *People v. Perry* (1976) 60 Cal.App.3d 608, 614–615 (*Perry*).) The degree of a witness's personal knowledge of a defendant's appearance goes to the weight, rather than to the admissibility, of the opinion. (*Leon*, at p. 601.)

We review a trial court's admission of lay opinion identification testimony for abuse of discretion. (*People v. Thompson* (2010) 49 Cal.4th 79, 128–130.) We will not disturb the court's evidentiary rulings "except on a showing the ... court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

In both *Mixon* and *Perry*, the robbery victims could not clearly see the robbers during the crime and thus could not identify them in surveillance videos or in-person lineups. In *Perry*, the court held that a police officer's identification of the defendant as one of the two robbers seen on a surveillance film of the crime was admissible as lay opinion testimony because the officer was familiar with the defendant from numerous contacts over the previous five years. (*Perry*, *supra*, 60 Cal.App.3d. at p. 610.) Similarly, in *Mixon*, the court held that an officer's identification of the defendant as the person seen in surveillance photographs taken during the commission of the robbery was an admissible lay opinion because the officer had "previously acquired familiarity with [the defendant's] features." (*Mixon*, *supra*, 129 Cal.App.3d at pp. 131–132.) In both cases, the officers' identifications were based on their personal knowledge of the defendants from contacts before the robbery; this helped the juries because each defendant had altered his appearance before trial. (*Mixon*, at p. 130; *Perry*, at p. 613.)

5

In *Ingle*, the defendant argued that a robbery victim's testimony that the defendant was the person in a surveillance video of the crime was inadmissible because the victim had not seen the defendant before the robbery. Relying on *Perry* and *Mixon*, the *Ingle* court rejected that contention. The *Ingle* court observed: "It is now clearly established that lay opinion testimony concerning the identity of a robber portrayed in a surveillance camera photo of a robbery is admissible where the witness has personal knowledge of the defendant's appearance at or before the time the photo was taken and his testimony aids the trier of fact in determining the crucial identity issue. [Citations.]" (*Ingle*, *supra*, 178 Cal.App.3d at p. 513.) Accordingly, "it was entirely appropriate" for the robbery victim to testify "based upon her personal observations and perceptions at the time the robbery occurred, that the person portrayed as the robber in the videotape was the defendant." (*Id.* at p. 514.) The victim's observation of the robber during the crime was sufficient.

In *Leon*, the California Supreme Court extended these holdings by ruling that a testifying officer could identify a defendant in surveillance footage even if the officer had *not* seen him before the crime; all that was required was that the officer be "familiar with defendant's appearance around the time of the crimes." (*Leon*, *supra*, 61 Cal.4th at p. 601.) In that case, the testifying officer first met the defendant the day after the robbery, when the defendant was arrested. (*Ibid*.) Because it was "undisputed" that the officer "was familiar with defendant's appearance around the time of the crimes," questions about "the extent of [the officer's] familiarity with defendant's appearance went to the weight, not the admissibility, of his testimony. [Citation.] … Moreover, because the surveillance video was

played for the jury, jurors could make up their own minds about whether the person shown was defendant." (*Ibid*.)

Here, the stabbing occurred on April 9, 2018. Ruggerio arrested defendant three days later, on April 12, 2018. Although the surveillance video in this case was unusually clear,[3] defendant was wearing a cap and sunglasses that helped obscure his face. More importantly, defendant's appearance had changed in the 15 months between the stabbing and his trial. Since defendant had been in custody, his complexion was far lighter than it had been. He'd also shaved off his beard, cut his hair, and gained weight. And, as defendant notes, other witnesses—who were not shown six-pack photo arrays until months later—had trouble identifying him. Accordingly, because Ruggerio's "testimony was based on his relevant personal knowledge and aided the jury, the court did not abuse its discretion by admitting it." (*Leon*, *supra*, 61 Cal.4th at p. 601.)

## 2.    The DNA Evidence

Defendant contends the court abused its discretion by admitting unduly confusing DNA evidence. We disagree.

### 2.1.   Legal Principles and Standard of Review

Only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The trial court has discretion to exclude relevant evidence

---

[3] Contrary to defendant's assertion, the video, which we have reviewed, was neither grainy nor blurry.

7

"if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

We review a court's decision to admit or exclude evidence for abuse of discretion. (*People v. Rodriguez*, *supra*, 20 Cal.4th at pp. 9–10.)

### 2.2. Proceedings Below

At defense counsel's request, the court held a hearing outside the jury's presence to determine "whether or not there [was] sufficient basis to render an opinion from the [DNA] sample that was taken from the [blue] bag."

Sheriff's Department crime lab analyst Kenneth Takigawa testified that in 2018, he tested DNA recovered from the strap of the blue bag defendant left behind on the bus. The sample contained a mixture of DNA from at least four people. Defendant was one possible contributor.

In 2019, the Sheriff's Department crime lab adopted STRmix, software that interprets DNA using probabilistic genotyping, a different methodology than the lab had previously used. Takigawa used the new software to reinterpret the results. Because the new methodology is more sensitive, this time, Takigawa discovered that the sample contained a mixture of five contributors rather than four. But the Sheriff's Department lab isn't validated to interpret findings containing so many contributors, so the new results were inconclusive. Takigawa stressed that the earlier result wasn't wrong; it was just achieved using a different analytical method.

Based on this testimony, the court held that although the "jurors are going to be challenged by this," the DNA evidence from the original test was admissible because the results from that test remained valid.

Later, in front of the jury, Takigawa testified that he initially identified at least three contributors on Gatorade bottles found in the blue bag but could draw no conclusions about the identities of those contributors. But when the tests were re-run using STRmix, the more sensitive test, both Gatorade bottles had identifiable three-contributor patterns in which defendant was one of the contributors.

As for the DNA sample taken from the handle of the blue bag, Takigawa testified that he initially identified four contributors, with defendant as one possible contributor. But when he re-ran the test using STRmix, the number of contributors increased to five, and no interpretation was possible due to complexity. Takigawa explained to the jury that the newer testing method did not invalidate the earlier findings.

### 2.3. The DNA evidence was not unduly confusing.

Defendant argues that the DNA evidence was too confusing and contradictory to be admitted, and that the court's ruling allowed the prosecution to rely on the evidence that supported its case while disregarding the evidence that undermined it. We disagree. The results were not inconsistent, as defendant claims. They were simply different—and the differences were easily explained by the increased sensitivity of the STRmix methodology.

Before adopting STRmix, Takigawa determined that defendant was one of four contributors to the DNA mixture on the handle of the blue bag. But the STRmix software was able to

detect a fifth contributor—and the lab's policies don't allow it to analyze such complex results. Defendant wasn't excluded from the mixture the second time; the sample was simply inconclusive.

For the Gatorade bottles, however, STRmix allowed Takigawa to determine that defendant contributed to each sample, a conclusion the earlier test was not sensitive enough to reach. Again, defendant had not been excluded under the earlier, less sensitive methodology; the results were simply inconclusive.

DNA evidence is inherently challenging, but courts regularly rely on juries to understand it—and Takigawa's testimony was not markedly more confusing than the usual DNA evidence. As such, we hold that the court did not abuse its discretion in admitting the evidence.

### 3. Defendant forfeited his challenge to the fines and fees; counsel was not ineffective for failing to object.

At sentencing, the trial court imposed a $300 restitution fine (§ 1202.4, subd. (b)), $30 court facilities assessment (Gov. Code, § 70373), and $40 court security fee (§ 1465.8). Citing *Dueñas*, in which our colleagues in Division Seven held that the restitution fine and court fees may not be imposed on a defendant who lacks the ability to pay them, defendant asks us to strike the restitution fine and fees. (See *People v. Dueñas* (2019) 30 Cal.App.5th 1157.)

Because *Dueñas* became final before he was sentenced in this case, we conclude defendant has forfeited this claim by failing to raise the issue below. (See *People v. Aguilar* (2015) 60 Cal.4th 862, 864.) Nevertheless, defendant contends counsel provided constitutionally defective representation in failing to object. We disagree.

Under either the federal or state Constitution, the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland v. Washington* (1984) 466 U.S. 668, 686 (*Strickland*).) To establish ineffective assistance of counsel, defendant must satisfy two requirements. (*Id.* at pp. 690–692.)

First, he must show his attorney's conduct was "outside the wide range of professionally competent assistance." (*Strickland*, *supra*, 466 U.S. at p. 690.) Then, he must demonstrate that the deficient performance was prejudicial—i.e., there is a reasonable probability that but for counsel's failings, the result of the proceeding would have been different. (*Id.* at p. 694.) "It is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a 'reasonable probability' that absent the errors the result would have been different." (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008.)

Claims of ineffectiveness must usually be "raised in a petition for writ of habeas corpus [citation], where relevant facts and circumstances not reflected in the record on appeal, such as counsel's reasons for pursuing or not pursuing a particular trial strategy, can be brought to light to inform" the inquiry. (*People v. Snow* (2003) 30 Cal.4th 43, 111.) "There may be cases in which trial counsel's ineffectiveness is so apparent from the record that appellate counsel will consider it advisable to raise the issue on direct appeal. There may be instances, too, when obvious deficiencies in representation will be addressed by an appellate

court *sua sponte*." (*Massaro v. United States* (2003) 538 U.S. 500, 508.) But those cases are rare.

Typically, if "the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation. [Citations.]" (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.) These arguments should instead be raised on collateral review. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.)

To be sure, defendant was represented by the public defender in this case, and "public defender clients, all of whom have already been financially evaluated and found indigent by the court, are legally entitled to a presumption of indigence for most purposes. [Citation.]" (*People v. Rodriguez* (2019) 34 Cal.App.5th 641, 645.) But "the Legislature has also recognized that a defendant's financial circumstances may change." (*Ibid.*) And defendant's ability to pay the $370 at issue here is fundamentally different than his ability to pay for a lawyer to represent him; assets that are insufficient to hire counsel may well be sufficient to pay the minimum fine and fees imposed in this case. Although the record before us contains no evidence on that point, defense counsel may have had information indicating that an ability-to-pay objection would be untenable. As such, because "the record does not shed light on why counsel" failed to object to the fine and fees in this case, we conclude defendant has not established that counsel was ineffective for failing to do so. (*People v. Scott, supra*, 15 Cal.4th at p. 1212.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

DHANIDINA, J.

13