Filed 6/25/25  P. v. Padilla CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>HECTOR PADILLA,<br><br>    Defendant and Appellant. | B335159<br><br>(Los Angeles County<br>Super. Ct. No. TA156824) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura Walton, Judge.  Affirmed.

Brad Kaiserman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

Hector Padilla appeals from a judgment entered after a jury found him guilty of first degree murder and found true the allegation that he personally used a firearm in the commission of the murder. The trial court sentenced him to 35 years to life in state prison.

Padilla asks us to reverse his conviction, arguing the trial court erred in allowing a detective who investigated the murder to offer his lay opinion that Padilla was one of the individuals seen on surveillance video at the crime scene at the time of the murder. We conclude Padilla forfeited this contention, and we reject his claim that his trial counsel rendered ineffective assistance, as admission of the evidence was proper.

In the alternative, Padilla challenges the firearm enhancement, arguing the trial court was required to dismiss it under Penal Code[1] section 1385 because the "application of [the] enhancement could result in a sentence of over 20 years." (§ 1385, subd. (c)(2)(C).) We conclude Padilla misinterprets the applicability of this statutory provision, and he has asserted no valid ground for dismissal of the enhancement. Accordingly, we affirm the judgment.

## BACKGROUND

On December 9, 2021, Eldon Meighan was killed by a gunshot wound to the head. Appellant Padilla was charged with the murder. Before Padilla's case went to trial, his codefendant,

---

[1] Undesignated statutory references are to the Penal Code.

2

Jose Arturo Garza, pleaded no contest to being an accessory after the fact to the murder of Meighan.

The following is a summary of pertinent evidence the prosecution presented at Padilla's trial. Padilla did not present any evidence in his defense.

## A. The Homicide

No trial witness presented an eyewitness account of the shooting. Geraldine Tench, Meighan's mother, was in the home she shared with Meighan and her two other sons[2] when Meighan was shot outside at the end of their driveway. Tench did not see the shooting or hear a gunshot. She testified at trial about circumstances she observed before and after the shooting.

Tench arrived home from work in the evening on December 9, 2021, and saw Meighan painting in the living room. She went to her bedroom to take a nap. She awoke when someone banged on her bedroom door and shouted, " 'Mom. Mom, Indio shot Eldon [Meighan]. Mom. Mom.' " She opened the door and saw Alan Magana, who "looked scared and frantic, [and] just kept repeating, 'Indio shot Eldon.' " Magana, who was friendly with Meighan and one of Meighan's brothers, was a frequent visitor at Tench's home, and he typically called her mom.[3]

Tench exited her home and ran down a driveway that led from her home and an adjacent apartment building to Imperial

_____

[2] References in this opinion to "Meighan" are to the victim Eldon Meighan, although one of Tench's other sons shares the same surname.

[3] Magana did not testify at trial. A detective interviewed him six weeks after the shooting but could not locate him thereafter.

Highway.  Magana followed her out.  Tench found Meighan lying at the end of the driveway at Imperial Highway.  She did not notice anyone else outside until she screamed for help and neighbors came outside.  Meighan died from a gunshot wound to the head.

During the investigation of the shooting, Tench provided a detective with a photo of a profile picture from a social media account, and she told the detective the man in the photo was "Indio."  The username on the social media account was "Indio Hector Padilla."  At trial, Tench identified appellant Padilla as Indio.  She provided the detective with another photo of a man she called "Turo."  The name on the social media account associated with this photo was "Turo Garza"; and the man in the photo was Padilla's former codefendant Jose Arturo Garza.

## B.    The Investigation of the Shooting

There were no shell casings found at the crime scene, and the murder weapon was not identified at trial.

### 1.    *Discovery of surveillance video*

A police officer who canvassed the area after the shooting observed a camera mounted on a residential building next door to Tench's home, east of the driveway where the shooting occurred.  The officer spoke with a woman inside the building, who said she had heard an argument next door but did not see what happened.  Using an iPad, she showed the officer surveillance video from the camera, which captured several people on the driveway around the time of the shooting.  The officer used his cell phone to record a 90-second clip of the surveillance video from the iPad.  The prosecutor played this video at trial (People's Exhibit No. 36).

4

Los Angeles Police Department (LAPD) Detective Francisco Zaragoza was assigned as the lead investigator in this case. After he reviewed the officer's cell phone recording of surveillance video, he asked the homicide bureau's intelligence gathering unit to try to obtain additional surveillance video of the crime scene. An officer from that unit contacted the owner of the same residential building next door to Tench's home and received permission to download 65 minutes of surveillance video captured by the camera on the building. As presented at trial, this surveillance video (People's Exhibit No. 10) was split into two video files, each around 30 minutes in length, and each showing the area around the crime scene from three different camera angles.

In this appeal, Padilla challenges the admissibility of Detective Zaragoza's lay opinion testimony that Padilla is one of the individuals shown in the surveillance video in People's Exhibit No. 10.[4] Before we describe Zaragoza's testimony regarding the events depicted in the video, we set forth his testimony explaining the methods he used to identify the individuals in the video.

2. ***Detective Zaragoza's investigation to determine the identities of the individuals in the surveillance video***

The surveillance video captured five people on the driveway at the time of the shooting, including Meighan.

---

[4] Hereafter, references to the surveillance video are to People's Exhibit No. 10.

### a. *Derrick Elder*

A few days after the shooting, Detective Zaragoza went back to the crime scene and saw a man on the driveway. Zaragoza spoke to him and learned that his name was Derrick Elder. He agreed to go to the station for an interview but never appeared. Zaragoza identified Elder as one of the individuals in the surveillance video. During her trial testimony, Tench also identified Elder in the video, referring to him as "Mad Ru." She explained that she knew him because he was "always there in the driveway."

### b. *Alan Magana*

During his investigation, Detective Zaragoza spoke with Magana. According to Tench's trial testimony, Magana is the man who told Tench immediately after the shooting that Indio shot Meighan. Zaragoza's interview with Magana (and an interview with Tench) helped Zaragoza identify the other men in the surveillance video, including appellant Padilla. According to Zaragoza's trial testimony, although Magana said during the interview that he only heard the gunshot and did not actually see the shooting occur, he disclosed other observations he made on the driveway that night that were consistent with his statement that Indio shot Meighan and with what Zaragoza observed on the surveillance video.[5] Zaragoza testified that Magana was one of the individuals shown in the video.

### c. *Jose Arturo Garza*

The surveillance video showed a car pull up to the driveway before the shooting. Two men exited. After the shooting, the

---

[5] Detective Zaragoza did not elaborate as to what Magana said he observed.

vehicle left the area with the same two men. Based on the characteristics of the vehicle as depicted in the video, Detective Zaragoza believed the vehicle was a Chevrolet Malibu. He was able to obtain the vehicle's license plate number from the video, and he used software available to the LAPD to identify the registered owner of the Malibu as Jose Arturo Garza. The residential address listed for Garza on registration and ownership documents associated with the vehicle was located around four blocks from the crime scene. Through additional research, Zaragoza determined that a woman named Virginia Padilla Garza lived at the same address. He also determined during the course of his investigation that Garza and Padilla were cousins.

Zaragoza obtained a search warrant for cell phone records in Garza's name. The records indicated that at the time of the shooting, Garza's cell phone was connected to a cell tower located within two-tenths of a mile of the crime scene. The records also showed that the cell phone account in Garza's name was terminated on December 10, 2021, the day after the shooting.

Zaragoza also obtained a search warrant for Facebook records of social media activity on an account in Garza's name. The records showed that Garza and one of Meighan's brothers communicated through Facebook's direct messaging application between October 21 and December 4, 2021.

Based on these vehicle, cell phone, and social media records, as well as interviews with Tench and Magana, and a booking photo of Garza, Zaragoza identified Garza as one of the

7

individuals in the surveillance video. He did not speak with Garza during his investigation.

### d. *Appellant Hector Padilla*

Detective Zaragoza obtained a search warrant for Facebook records of social media activity on accounts in Padilla's name that used a photo of Padilla as the profile picture. One account in the name "Hector.Padilla.547" used the screen names "Indio the Man" and "Indio 211" and included Turo Garza and Mad Ru (Elder) as followers of the account. Another account in the name "Indio Hector Padilla" listed Jose Garza as a follower, and the records showed communications between Padilla's and Garza's accounts.

When Padilla was arrested for Meighan's murder on February 23, 2022, an officer took photos of Padilla as part of the booking process. One of the photos showed a tattoo of the name "Indio" on Padilla's back.

Zaragoza testified that he interviewed Padilla after Padilla's arrest for around 40 minutes. During the interview, Zaragoza showed Padilla a still photograph from the surveillance video, depicting the location where the shooting occurred. Padilla said Tench's residence was a "hangout" spot and he had been there before. He knew that Meighan lived there with his mother and two brothers and he was able to describe the layout of the residence. He admitted he had been there on December 9, 2021, the day of the shooting, but said he was there earlier in the day in the morning. Zaragoza showed Padilla a photo of Garza, and Padilla identified him by name and said he was his cousin. Padilla sought information from Zaragoza, including whether the surveillance video clearly showed his face and whether the police

8

had recovered the gun used in the shooting. Padilla denied that he shot Meighan.

Based on Padilla's social media and booking photos, the interviews with Tench and Magana, and the 40 minutes he spent interviewing Padilla at the station, Zaragoza testified that in his opinion Padilla was one of the individuals in the surveillance video. He stated that he observed a point in the video when the glow from a lit cigarette illuminated the face of one of the individuals and he could discern the man's features: "short bushy hair," "medium to dark complexion," and a "bony" facial structure with high cheekbones and a "well defined" jawline. He identified Padilla as the man in the video with these features.[6]

### 3. *Detective Zaragoza's trial testimony regarding the events shown in the surveillance video*

Detective Zaragoza testified that the surveillance video showed the following:

At around 8:40 p.m. on December 9, 2021, Magana was sitting on the front steps of Tench's home. The front door was closed and the lights were on inside the house. Through the window, a person was visible who was painting. Elder was sitting in a vehicle in the driveway.

A Chevrolet Malibu traveled west on Imperial Highway and stopped in front of the driveway leading to Tench's residence. Garza exited from the driver seat and Padilla exited from the front passenger seat. Elder walked toward the street and made contact with Garza and Padilla. The three men walked onto the

---

[6] In the Discussion section of this opinion, *post*, we summarize the exchange between the parties and the trial court regarding the admissibility of Detective Zaragoza's identification of Padilla in the surveillance video.

driveway together.  Elder lit a cigarette which "illuminate[d]" his face in the video.  Padilla also had a cigarette in his mouth, and "the flame illuminat[ed] his face."

As Garza, Padilla, and Elder spoke, Padilla waved his hand, pointing north.  Meighan and Magana were walking south on the driveway, away from Tench's home and toward Imperial Highway.  Padilla greeted Meighan and Magana with a handshake or a "fist bump."  Padilla and Meighan moved away from the rest of the group, walking closer to the Malibu.  The passenger side door was open.

Garza walked around the back of the Malibu and toward the driver side of the car.  Elder walked toward the car, but before he got there, he raised both hands and "started to backpedal away" from the area.  According to Detective Zaragoza, the video showed some type of "fast motion" in the area where Padilla was standing, and Padilla entered the front passenger seat of the car.  Elder jumped and looked back at the car, appearing "startled."  The car drove off.  Meighan was lying on the sidewalk "in a fetal position."[7]

## C.    Jose Garza's Trial Testimony

Garza testified at trial and admitted he pleaded no contest to being an accessory after the fact to the murder of Meighan.  He also conceded that he was the man in the social media photo

---

[7] Detective Zaragoza did not identify anything else in the video indicating that a shooting occurred, and the prosecution did not argue that there was (e.g., a gun in a hand or a muzzle flash).

associated with the account name "Turo Garza" that Tench provided to Detective Zaragoza.

Garza denied that he ever owned the Chevrolet Malibu shown in the surveillance video. He acknowledged that the Department of Motor Vehicles registration and ownership documents for the vehicle listed his name and correct home address, but he asserted that the documents were "falsified."

He also denied that he used the nickname Turo or the Facebook account that was in his name and displayed his photo as the profile picture. He claimed someone else made the account, and the communications between him and Meighan's brother reflected on the account (referenced above) were not his. He said he did not know Meighan's brother.

Garza also testified that he did not know anyone named Hector Padilla, and he was not familiar with the nickname Indio. The prosecutor showed Garza a Facebook business record showing contacts for "Cuzzo Indio" and "Hec. Indio" on the account in him name. Garza said he did not know who those people were and he did not have a cousin who used the name Indio. He also said he did not recognize anyone in the courtroom (i.e., Padilla).

## D.     Verdicts and Sentencing

The jury found Padilla guilty of first degree murder and also found true the allegation that he personally used a firearm in the commission of the murder, within the meaning of section 12022.5, subdivision (a).

In a sentencing memorandum, the district attorney urged the trial court to sentence Padilla to 35 years to life in state prison, 25 years to life for the murder, plus the high term of 10

years for the firearm enhancement.  The district attorney acknowledged in the memorandum that Padilla's potential exposure was more than 35 years to life based on prior conviction allegations in the information: a prior serious felony allegation (§ 667, subd. (a)) and a prior strike conviction allegation (§§ 667, subds. (b)-(i) & 1170.12, subds. (a)-(d)).

In his sentencing memorandum, Padilla asked the court to impose a sentence of 25 years to life.  He requested the court dismiss the prior conviction allegations and the firearm enhancement.  Among other things, he argued section 1385 required the dismissal of an enhancement when the "application of [the] enhancement could result in a sentence of over 20 years." (§ 1385, subd. (c)(2)(C).)

The trial court found the prior conviction allegations to be true, but exercised its discretion to strike the prior serious felony enhancement and dismiss the prior strike.  Both sides submitted without argument on sentencing.  The court sentenced Padilla to 35 years to life in state prison, 25 years to life for the murder, plus the high term of 10 years for the firearm enhancement.  The court explained that it selected the high term based on the facts of the case, Padilla's criminal history, and the fact the court declined to impose punishment for the prior serious felony enhancement and the prior strike.

## DISCUSSION

**A.  Padilla Forfeited His Challenge to the Admission of Detective Zaragoza's Opinion That Padilla Was Shown in the Surveillance Video, and His Counsel Did Not Render Ineffective Assistance**

Padilla contends "the prosecution laid an insufficient foundation for the admission of Det. Zaragoza's lay opinion identifying Padilla in the surveillance footage," and the trial court should have excluded the testimony.  He also contends the admission of the evidence rendered his trial fundamentally unfair in violation of his federal and state constitutional rights.

### 1.  *Proceedings below*

During Detective Zaragoza's trial testimony, after he had narrated the events he observed in the surveillance video without offering his opinion that Padilla was one of the men in the video, the prosecutor showed Zaragoza a still photograph from the video (People's Exhibit No. 50) and asked him if the man in the photo "with the lit cigarette" was in the courtroom.  Defense counsel objected based on lack of foundation and speculation.  The parties and the trial court had a conference at sidebar.

The court asked the prosecutor "what foundation [he had] to lay and offer for this detective to make an identification from the video."  The prosecutor responded:

"The identification is his own lay opinion after reviewing it dozens of times, zooming in.

"He said he checked social media.  He checked booking photos.  He actually had an interview with the defendant that hasn't been established as of yet.  But it's just asking for his own

13

lay opinion, which the jurors themselves will have to do, in fact, as finders of fact, to say that it's the man who is on the video.

"So, it's just a lay opinion, not -- nothing more. Nothing more than his own lay opinion from his investigation and the multiple photographs and time spent investigating this case."

Defense counsel responded:

"I think having him identify based on his own opinion is prejudicial. The jury can look at the video, look at the pictures themselves. They will get all of that stuff themselves and they can make that decision themselves.

"But what he testified to is the picture, the video itself is grainy. He talked about certain features that he noticed from the person that is in the video and in the photograph. But then to let him draw the conclusion and give the jurors, basically, his own positive I.D. based on grainy video and photographs that he, himself, used that word 'grainy,' is – is far too prejudicial.[8]

"Again, they are gonna be able to see the picture. They are watching the defendant here in court. They will be able to make

---

[8] Detective Zaragoza did not testify that the surveillance video was grainy. He stated that People's Exhibit No. 50, the still photograph from the surveillance video that the prosecutor showed him, was "a lot grainer" than the video.

In closing argument, the prosecutor indicated the reason a muzzle flash was not visible in the surveillance video was because the video was "dark[,] grainy, albeit poor quality." She added, "But you know what's not poor quality? What is not poor quality is the moment that that cigarette is lit, giving you the ability to see the facial contours of Hector Padilla's face. Very distinct bone structure, cheek structure, goatee, which is the hair that is around his upper lip and lower chin, the posture and the slimness of his body throughout the entire video."

14

that decision themselves whether they think that the grainy video looks like Mr. Padilla.

"I don't think – I think it's far too prejudicial to allow the detective at this point to identify Mr. Padilla and make that a definitive positive I.D."

The prosecutor added:

"And the People do not agree with everything just said. But what he essentially says, it goes to weight, not admissibility.

"And the cross-examination of his identification likely will be like an identification expert or handwriting expert, anyone can give their lay opinion or their expert opinion. It's up for cross-examination because it goes to the weight and not the admissibility.

"So if this detective of 15 years reviewing the surveillance a dozen times, possibly on equipment that is more clear than what is presented in the courtroom's material, further investigation with the name, social media, booking photos, interview, he can give his own lay opinion, which the defense attorney can explore to her heart's content on cross-examination as it goes to the -- it goes to the weight. That information is for the jury to ultimately determine on their own."

The court stated that a police officer could not make a positive identification of a suspect in a video unless the officer had personal contact with the suspect, "an opportunity to meet, see, speak to the defendant, and then peruse the videos." Therefore, the court sustained defense counsel's objection "until and unless [the prosecutor could] lay that proper foundation." In an exchange with the prosecutor regarding how to lay the foundation, the court stated: "Did you interview the defendant? [¶] Yes. [¶] When? Where? How long did that interview take

15

place?  What did the interview consist of?  Was anybody else present -- to lay that he's, at least, had some personal contact throughout his investigation with him.  And then after having that personal interview with him, however -- and that goes to the weight -- the length, the time, the location of the interview goes to the weight of his lay opinion as to who was in the video."  Defense counsel did not dispute that Detective Zaragoza could offer his lay opinion that Padilla was the person shown in People's Exhibit No. 50 and throughout the surveillance video if Zaragoza testified to personal contact with Padilla during a post-arrest interview.

When the direct examination of Zaragoza resumed, the prosecutor showed Zaragoza a photograph and asked if he knew when it was taken.  Zaragoza said it was a booking photo of Padilla.  The prosecutor asked if Zaragoza had personally come into contact with Padilla on the day he was booked.  Zaragoza testified that on that day, he had contact with Padilla for around 40 minutes and had an opportunity to see and observe him.  After that contact with Padilla, Zaragoza went back and reviewed the surveillance video and social media content.  The prosecutor asked Zaragoza, "After you reviewed that information -- going back to People's 50 -- with the time that you spent personally with the defendant, Mr. Padilla, can you identify in your own lay opinion who that is depicted in People's 50?"  Zaragoza identified Padilla.  Defense counsel raised no further objection to Zaragoza's identification of Padilla in the surveillance video.[9]

---

[9] Later in his testimony, Detective Zaragoza discussed the substance of his interview with Padilla, as summarized above.  And he reiterated that his interaction with Padilla on the day he

16

### 2. *Padilla forfeited his challenge to the admission of the evidence*

The Attorney General argues Padilla forfeited his challenge to the admission of Detective Zaragoza's lay opinion testimony identifying Padilla in the surveillance video. We agree.

To preserve an appellate challenge to the admission of evidence, a defendant must make a timely objection to the evidence, making "clear the specific ground of the objection." (Evid. Code, § 353, subd. (a); *People v. Partida* (2005) 37 Cal.4th 428, 433.) "An objection is sufficient if it fairly apprises the trial court of the issue it is being called upon to decide." (*People v. Scott* (1978) 21 Cal.3d 284, 290.) A corollary of this rule is that a "party cannot argue [on appeal that] the [trial] court erred in failing to conduct an analysis it was not asked to conduct." (*Partida*, at p. 435.)

Defense counsel objected to Zaragoza's opinion testimony based on lack of foundation and speculation *before* the prosecution ultimately laid a foundation by eliciting testimony that Zaragoza had personally interacted with Padilla. The parties and the trial court had a discussion about how the prosecution could lay a sufficient foundation for the opinion testimony. The court noted that the foundation for the opinion should include when and where the contact took place, how long it lasted, and the nature of the contact. When the prosecutor indicated that the contact was a post-arrest interview with Padilla, defense counsel did not dispute that testimony regarding

---

was arrested assisted him in forming his opinion that Padilla was shown on the surveillance video. He had an opportunity that day to observe Padilla sitting and standing and he was able to ascertain his size and physique.

17

such an interview could establish a sufficient foundation. The court sustained the defense's objection "until and unless" the prosecution could lay a sufficient foundation. The court did *not* rule that the testimony was inadmissible.

In accord with the trial court's ruling, the prosecutor examined Zaragoza about the nature and extent of his personal contact with Padilla, and Zaragoza testified in response. Then, the prosecutor asked Zaragoza for his opinion as to the identity of the person in a still photograph from the surveillance video, and Zaragoza identified Padilla. The court allowed the questions and answers, and there was no further discussion on the issue.

Padilla's contention on appeal that there was "insufficient foundation for the admission of Det. Zaragoza's lay opinion identifying Padilla in the surveillance footage" is forfeited. The prosecution laid a foundation for the opinion testimony in the manner suggested by the court and with the acquiescence of defense counsel. The defense gave no indication it believed the foundation remained insufficient. To preserve this contention for appellate review, it was incumbent on the defense to raise an objection to the sufficiency of the foundation the prosecution ultimately laid (or to make a motion to strike the testimony if defense counsel believed a renewed objection was unnecessary but the foundation was still insufficient). Instead, by its silence, the defense indicated it believed the prosecutor cured the lack of foundation issue, and the testimony was admitted. Padilla cannot challenge the sufficiency of the foundation now, without having given the prosecutor an opportunity to respond to an objection or a motion to strike, or the court an opportunity to rule.

18

We reject Padilla's assertion that, "Because the trial court ruled that the prosecution only needed to prove essentially *any* personal contact between Det. Zaragoza and Padilla, and because the prosecution did so, any further objection would have been futile in light of the court's ruling." If the defense believed the post-arrest interview was insufficient personal contact to lay a foundation for the opinion, it was required to say so in order to preserve the contention for review. Instead, as discussed above, defense counsel remained silent when the court outlined how the prosecutor could lay a foundation for the opinion, and defense counsel registered no objection to the proposed method or to the testimony itself.

Padilla's claim that the admission of the evidence rendered his trial fundamentally unfair in violation of his federal and state constitutional rights is also forfeited. To preserve a constitutional claim arising out of a trial court's decision to exclude or admit evidence, a defendant must raise the claim in the trial court. (*People v. Riggs* (2008) 44 Cal.4th 248, 292.) Before the prosecutor laid a foundation for the opinion testimony, defense counsel asserted admission of the evidence was "prejudicial," arguing that the jury was in the same position as Detective Zaragoza to identify Padilla in the surveillance video. However, defense counsel did not raise a constitutional claim or even maintain that the admission of the evidence was prejudicial in light of Zaragoza's testimony regarding his personal contact with Padilla.

Padilla argues, if there was a forfeiture, his counsel rendered ineffective assistance. Accordingly, we must address the merits of his challenge to the admission of the evidence.

19

**3.** ***Defense counsel was not ineffective in deciding not to challenge the sufficiency of the foundation the prosecution laid or raise a constitutional challenge to the admission of the evidence***

To prevail on an ineffective assistance of counsel claim, a defendant must show: "(1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.) We conclude Padilla has not established the first prong of this test, so we need not reach the second.

"A lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony. (Evid. Code, § 800.) '[T]he identity of a person is a proper subject of nonexpert opinion. . . .' " (*People v. Leon* (2015) 61 Cal.4th 569, 601 (*Leon*).) "Court of appeal decisions have long upheld admission of testimony identifying defendants in surveillance footage or photographs." (*Ibid.*)

On appeal, Padilla argues there was insufficient foundation for Detective Zaragoza's opinion identifying him in the surveillance video because Zaragoza had no contact with him until after the crime. Defense counsel's performance did not fall below an objective standard of reasonableness in deciding not to argue to the trial court that a post-arrest interview was

20

insufficient foundation to support Zaragoza's opinion. Long before Padilla's trial, in *Leon*, *supra*, 61 Cal.4th 569, our Supreme Court rejected the defendant's argument that post-arrest contact between the detective and the defendant—as opposed to pre-arrest contact—was insufficient to support the detective's opinion that the defendant was shown in surveillance videos of two robberies, deeming it a "distinction without a difference." (*Id*. at pp. 600, 601.) The Supreme Court explained, "It is undisputed [the detective] was familiar with defendant's appearance around the time of the crimes. Their contact began when defendant was arrested, one day after the . . . robbery. Questions about the extent of [the detective]'s familiarity with defendant's appearance went to the weight, not the admissibility, of his testimony. . . . Moreover, because the surveillance video was played for the jury, jurors could make up their own minds about whether the person shown was defendant. Because [the detective]'s testimony was based on his relevant personal knowledge and aided the jury, the court did not abuse its discretion by admitting it." (*Id*. at p. 601.)

Padilla attempts to distinguish *Leon*, arguing, "[U]nlike in *Leon,* in which the detective saw the defendant nearly ten times after his arrest [citation], here, Det. Zaragoza only testified to the single interview with Padilla.[10] Moreover, unlike in *Leon*, in which the detective was familiar with the defendant's distinctive jacket that was worn in the surveillance footage and worn on the day of the defendant's arrest, here, there was no distinctive clothing that Det. Zaragoza was familiar with." While these factors may be relevant to the *weight* of Zaragoza's opinion

---

[10] The detective in *Leon* "spent about two hours" total with the defendant during the course of "nearly 10" contacts with him. (*Leon*, *supra*, 61 Cal.4th at p. 600.)

21

testimony, they do not bear on the *admissibility* of the testimony. In closing argument, defense counsel commented on the weight of Zaragoza's opinion testimony:

"Another thing he [Detective Zaragoza] said was he spent approximately 40 minutes with Mr. Padilla and made a determination that the person in the video has to be Padilla. That was the only time he ever met Mr. Padilla. He never had any prior contacts, and since then he hasn't had any other contacts. 40 minutes. [¶] You as jurors have been sitting here with Mr. Padilla for days. Can you, having sat here with Mr. Padilla, say with certainty that the person in that video is actually him, with the poor quality, the poor lighting? And not actually knowing him or anyone else in his family that might look like him? Can you say with certainty that that is him?"

"The constitutional guaranty of effective assistance of counsel . . . does not require counsel make every conceivable [objection] to avoid being deemed incompetent." (*People v. Kelley* (1990) 220 Cal.App.3d 1358, 1374.) Defense counsel was not ineffective for failing to object to the foundation set forth by the prosecution; as just explained, any such objection would not have been well-taken, and the trial court properly admitted the lay opinion testimony. The prosecution established that Zaragoza had close, personal contact with Padilla near the time of the shooting and was familiar with his physical characteristics.[11] Such "relevant personal knowledge" was helpful to the jury, but the "jurors could make up their own minds about whether the person shown" in the video was Padilla (*Leon*, *supra*, 61 Cal.4th

---

[11] Padilla was arrested two and a half months after the crime. No evidence was presented at trial indicating his appearance changed during that time.

at p. 601), as defense counsel encouraged them to do.  There was no state law error or violation of Padilla's constitutional rights.

## B.    The Trial Court Did Not Err in Imposing the Firearm Enhancement

Padilla contends section 1385, subdivision (c)(2)(C), required dismissal of the firearm enhancement, and the trial court erred in imposing it.  The Attorney General argues Padilla forfeited this contention because he did not make clear in his sentencing memorandum that his citation of this statutory provision related to the firearm enhancement; rather, he asserted it precluded imposition of punishment for a prior strike conviction.  (But see, e.g., *People v. Olay* (2023) 98 Cal.App.5th 60, 67 ["[S]ection 1385, subdivision (c) does not apply to the Three Strikes law"].)  Although we agree with the Attorney General that Padilla's sentencing memorandum could have been clearer on this point, we conclude that his discussion of section 1385, subdivision (c)(2)(C), and its application to enhancements, preserved the issue for review.  But even if we found forfeiture, we would address the issue on the merits because our resolution of the contention involves a pure question of law.  (See *People v. Welch* (1993) 5 Cal.4th 228, 235 [cases reviewing the merits of a claim of sentencing error, raised for the first time on appeal, "generally involve pure questions of law that can be resolved without reference to the particular sentencing record developed in the trial court"].)

Under section 1385, "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute."  (§ 1385, subd. (c)(1).)

Section 1385 lists nine mitigating circumstances, each of which "weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (§ 1385, subd. (c)(2).)

Padilla contends that one of the nine mitigating circumstances applies here and requires that the firearm enhancement imposed under section 12022.5, subdivision (a), be dismissed. He invokes subdivision (c)(2)(C) of section 1385, which provides, "The application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed."

Padilla misinterprets the applicability of this mitigating circumstance. On its face, subdivision (c)(2)(C) of section 1385 applies only when a sentence of over 20 years could result *because of the application* of the enhancement. (See Couzens, Bigelow & Prickett, Sentencing Cal. Crimes (The Rutter Group 2024) § 12:11, subd. (F)(3) ["There will be no entitlement to relief [under section 1385, subdivision (c)(2)(C)] unless it is the application of the term for the enhancement that results in a sentence longer than 20 years"].)

Here, the trial court could not have imposed a lesser sentence for the first degree murder than it did—25 years to life. (See § 190, subd. (a).) Given that sentence, the *application* of the firearm enhancement here could not have *resulted* in a sentence of over 20 years, and Padilla is not eligible for relief under subdivision (c)(2)(C) of section 1385. He cites no case indicating section 1385 forecloses imposition of a firearm enhancement on a first degree murder conviction, and we are aware of none.

Padilla also argues the trial court erred in imposing the firearm enhancement because the court did not make a finding

24

that "dismissal of the enhancement would endanger public safety," under subdivision (c)(2) of section 1385. The trial court need only make such a finding if it first finds one of the mitigating circumstances enumerated in subdivision (c)(2)(A)-(I) of the statute: "Proof of the presence of one or more of these [mitigating] circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (§ 1385, subd. (c)(2).) Padilla only cites one mitigating circumstance and, as we have already concluded, it is inapplicable here. Thus, the court was not required to make a finding regarding whether dismissal of the enhancement would endanger public safety.

Padilla raises no other argument indicating it was in the furtherance of justice to dismiss the firearm enhancement under section 1385. Thus, we have no cause to order dismissal of the enhancement.

## DISPOSITION

The judgment is affirmed.
NOT TO BE PUBLISHED

M. KIM, J.

We concur:

BENDIX, Acting P. J.

WEINGART, J.

25